**William Henry FLAMER, Defendant Below, Appellant,**

v.

**STATE of Delaware, Plaintiff Below, Appellee.**

Supreme Court of Delaware.
Submitted: June 24, 1982.
Re-submitted Following Supplemental Briefing: Dec. 6, 1982.
Decided: Feb. 7, 1983.
Opinion on Death Sentence Submitted Following Supplemental Briefing and Argument: May 7, 1984.
Decided: Sept. 20, 1984.

Dana Reed, Deputy Atty. Gen., Dover, John A. Parkins, Jr. (argued), Deputy Atty. Gen., Wilmington, and Gary A. Myers (argued), Deputy Atty. Gen., Georgetown, for plaintiff below, appellee.

Dennis A. Reardon and Richard E. Fairbanks (argued), Asst. Public Defenders, Dover, for defendant below, appellant.

Before HERRMANN, C.J., McNEILLY, QUILLEN, HORSEY and MOORE, JJ., constituting the Court en Banc.

McNEILLY, Justice:

At approximately 8:00 A.M. on a snowy February 7, 1979, Arthur Smith, thirty-five year old son of Alberta and Byard Smith, walked across the street to his parents' home and found them sprawled on the living room floor obviously murdered in cold blood.[1] The ensuing police investigation led to the arrest, separate jury trials, convictions, and mandated death sentences for Andre Deputy and William Henry Flamer. In this appeal, we are concerned only with the convictions and sentences of William Henry Flamer and the record of the suppression hearing held before the Court prior to the severance for trial of the charges against the two individuals, Flamer and Deputy.

William Henry Flamer appeals his convictions and sentences on four charges of Murder in the First Degree, one charge of Robbery in the First Degree, one charge of Possession of a Deadly Weapon During the Commission of a Felony, and one charge of Misdemeanor Theft. As to the four counts of Murder in the First Degree, the jury in a separate hearing following the guilt phase of trial mandated the death penalty. Defendant asserts fifteen separate grounds for reversal, and we consider each ground as we find it to be applicable to the guilt phase or death penalty phase of trial. For the reasons herein elaborated upon, we affirm.

As Arthur Smith approached his parents' home that morning, he first noticed the car

---

1. When the victim's bodies were examined by Dr. Judith G. Tobin, a forensic pathologist and Assistant State Medical Examiner, it was established that the cause of death of each victim was massive hemorrhage due to multiple stab wounds of the head and neck. In the case of Byard Smith, Dr. Tobin counted and measured seventy-nine wounds; sixty-four involving the head and neck, thirteen involving the posterior shoulders and back, and two defense wounds on the hands. In Alberta Smith's case, Dr. Tobin determined that she had a total of sixty-six wounds; twenty-six of the head and neck; twenty-nine on the anterior trunk; eight on the posterior or her back, and three defense wounds on her hands and arms.

was gone. Receiving no acknowledgment of his presence, Arthur entered the house and saw his dead bloody parents lying on the floor. He noticed that their television was missing, but without further investigation he went to a garage across the street and called the police.

In response to Mr. Smith's call received at Troop 5 in Bridgeville, State Police officers Daral Chaffinch and Raymond P. Callaway, Jr. proceeded to the victims' home, a small two-story house just west of the Harrington town limits fronting on State Highway Route 14. Entrance into the home was gained through a side door which opens into the kitchen. On the highway side of the kitchen there was a living room and a small unused front room. The victims' bodies were found on the floor of the living room with apparent stab wounds in the throat and chest areas. Byard Smith's trouser pockets were turned inside out, chairs were overturned, bags of frozen food were strewn about the kitchen floor, and there was what appeared to be blood on the floor around the victims and on the couch next to the body of Alberta Smith. A sofa cushion also had apparent cut marks around the blood stained area.

Earlier that morning, Clara Green of Felton, Delaware was awakened by the flashing lights of a four door car parked on the opposite side of the road from her home on Church Street near the town limits of Felton. She went back to sleep but sometime between 7:30 and 8:00 A.M. she awakened again and noticed the car still there with its lights flashing and motor running. After breakfast, she saw a man walking toward downtown Felton with a suitcase and something else under his arm. The man she saw was dressed in dark clothes and cap, and appeared to be a black man. At that time, the car was not running and the lights were out.

At approximately 10:30 A.M., the investigating officers received a call from Troop 3 that one of their officers had recovered the Smiths' vehicle on Church Street just north of the town limits of Felton. Upon receiving that information, the officers proceeded to Felton and interviewed possible witnesses. Among those interviewed was Mrs. Green and a William Wooters, who at approximately 7:30 that morning had opened the Felton Hardware Store where he worked. Within an hour or so, a man entered the store and asked to use the phone. Wooters later that morning gave the police a description of that man which led to the identification of defendant, William Henry Flamer, by a daughter of the victims who knew Flamer because of their family ties. Flamer's mother was a half-sister to Alberta Smith, one of the victims, and both families had always lived in close proximity to each other.

The police then went to the Flamer residence at 147 Mispillion Street in Harrington, approximately two hundred yards distance from the victims' home. Mrs. Florence Benson, grandmother of defendant Flamer, answered the door, and after informing Detectives Chaffinch and Callaway that Flamer was not at home, asked them in to look for themselves. The house is a two-story four room house heated only by a wood stove in the living room. At the time the detectives entered, no one appeared to be downstairs except Mrs. Benson and a man identified as William Johnson, Flamer's father.[2] Mrs. Benson asked the detectives if they wanted to go upstairs. They replied in the affirmative, and as soon as they walked into Flamer's bedroom, a cardboard box was observed containing frozen food packaged in bags of the same type as those strewn about the victims' kitchen floor. Downstairs they found a bayonet on a stand in the kitchen with what appeared to be dried blood stains on the blade. They also found a suitcase and, in the kitchen closet, a television set which was identified a short time later by Arthur Smith as the television set missing from his parents' home. Armed with this evidence,

---

**2.** It was later learned that Mrs. Benson, Flamer and his father, and Andre Deputy, the co-defendant, whose trial was severed from the Flamer trial, all lived in the house at that time.

the detectives went to Justice of the Peace Court 6 in Harrington and obtained a warrant for Flamer's arrest for Murder in the First Degree.

While at Court 6, information was received that Flamer was at the Blue Moon Tavern, south of Woodside on Route 13. Detective Callaway, Corporal Porter, Detective Brode, and two Harrington police officers were dispatched to the location for the purpose of apprehending Flamer. Corporal Porter volunteered to join the group because he was a lifelong resident of Harrington and had known Flamer for a long time. Flamer, Andre Deputy, and Ellsworth Coleman were apprehended walking near the Tavern and were taken to Troop 5 at Bridgeville. Coleman was soon released; Flamer, of course, had been arrested; and Deputy was detained for further questioning. Corporal Porter had become suspicious of Deputy because he gave his name as Ray Anderson, a resident for one year of Harrington, and Porter had a feeling that if Anderson was, in fact, a year long resident of Harrington he would have known him by name or sight since Harrington is a small town of approximately twenty-five hundred people. In addition, Corporal Porter felt Deputy was being evasive, and he was not sure of Deputy's connection with Flamer and the murders. In any event, at Troop 5, Corporal Porter for his own safety patted down Deputy and discovered in his coat pocket two watches, folded money, a black wallet containing victim Byard Smith's Delaware driver's license with the victim's picture on it, an automobile registration card in the name of Byard Smith, a newspaper coupon, thirty-nine dollars, and Byard Smith's Social Security card.

The questioning of Flamer and Deputy, sometime separately and at least once together, continued from approximately 4:00 o'clock in the afternoon until 7:30 or 8:00 o'clock in the evening. During the interrogation, Detective Chaffinch noticed what appeared to be blood around the cuticles of the fingernails on both hands of Flamer.

Likewise, there appeared to be blood on the sleeves of Flamer's coat and fresh scratches on his neck and chest. When questioned about the blood on and about his person, Flamer stated that at Deputy's request he had gone to the victims' home with Deputy after the murder and had gotten blood on his coat and hands by moving frozen food packages. Testifying in his own defense, Flamer stated on direct examination that he also had gotten blood on his shoes, specifically stating:

> Because there was blood all over them from the floor. Like the area, the place was all bloody and messy and stuff and I had blood on my shoes so I wiped it off.

When confronted with Deputy's claim that he (Flamer) had given Deputy the victim's wallet and watches, Flamer vehemently denied the truthfulness of Deputy's claim, and continued to deny it when Deputy repeated the claim in a face-to-face confrontation during the initial police interrogation. Corporal Porter testified that during this interrogation of Flamer, Flamer told him that he, Deputy and an individual by the name of Johnny Christopher went into the victims' home, that Johnny had been the one who did the stabbing, and that he had gotten blood on his coat as a result of Christopher going into the house and handing out the frozen food and other property. Corporal Porter also testified that it was at this time Flamer whispered to him that Ray Anderson was really not Anderson but was, in fact, Deputy who was wanted for an unrelated murder in Wilmington.

Throughout the interrogation on the afternoon of the seventh, the police were given irreconcilable stories by both Flamer and Deputy, each accusing the other of the murders. Finally, between 7:00 and 7:30 P.M., interrogation ceased for the night. Flamer was placed in the troop cell for the night, and Deputy was taken to a cell in the Bridgeville police station. The cell at the troop was described by Detective Callaway as a heated holding area approximately four feet wide and fifteen feet long. De-

tective Callaway stated that the cell has two lights, two windows, two steel bunks furnished with army blankets, running water to drink and use for washing, and a toilet. To the contrary, Flamer testified that the troop cell was cold, and that he was dressed only in a silk tee shirt and army pants and that he was furnished no blankets for warmth.

No effort was made by the police that night to take Flamer to Court for arraignment since the roads were hazardous due to snow, and the closest Justice of the Peace Court open that night was Court 7 in Dover. To have taken Flamer to court for arraignment that night would have necessitated driving from Bridgeville to Dover and then back to Georgetown to the Sussex Correctional Institution.

The next morning Detectives Porter and Brode, without further interrogation, took Flamer to Justice of the Peace Court No. 7 for his initial appearance pursuant to Justice Peace Criminal Rule 2. At that appearance, Rule 2(b) requires that the Justice of the Peace inform the defendant of the complaint against him, of his right to retain counsel, and of his right to have a preliminary hearing. He shall also inform the defendant that he is not required to make a statement, and that any statement made by him may be used against him. The committing Justice of the Peace shall also allow the defendant reasonable time and opportunity to consult counsel and shall admit the defendant to bail (except in capital cases as here).

At this initial appearance, Flamer was committed without bail to the Department of Corrections. Since there was no constable or other court officer to take defendant into custody the police returned defendant to the police troop to await transportation to the Correctional facility by a traffic uniformed officer in accordance with normal state police operating procedure.

While at Justice of the Peace Court No. 7, defendant had called his mother who then met defendant at the troop as requested. According to defendant, Corporal Por-

ter told his mother, "We got the evidence on him. Why don't you make him tell the truth" or "tell him to tell the truth". Flamer also testified that Corporal Porter told his mother about some of the evidence the police had which involved her son, Flamer, in the murder of her sister and brother-in-law, that, "she (his mother) wouldn't listen to me. She was crying. I couldn't get nothing through to her. I felt everything was against me." Flamer's mother left the troop without any further communication with her son. It was after his mother left that Flamer then confessed to the police his participation in the horrible deaths which he and Deputy throughout their interrogation had each attributed to the other while maintaining his own innocence.

## TRIAL

### I

As to the guilt phase of the trial defendant asserts five grounds of error: (1) The Trial Court erred in sentencing defendant to multiple sentences on four counts of Murder in the First Degree, Robbery in the First Degree and Possession of a Deadly Weapon during the Commission of a Felony. (2) The Trial Court erred in denying defendant's Motion to Suppress a confession on the ground of illegal detention. (3) The Trial Court erred in denying defendant's Motion to Suppress evidence seized as a result of a search of his residence. (4) There was insufficient evidence to convict defendant of four charges of Murder in the First Degree since there were only two victims. (5) There was insufficient evidence to convict defendant of Robbery in the First Degree and two charges of Murder in the First Degree with Robbery in the First Degree as the underlying felony. We consider those assertions seriatim.

### II

■ The defendant contends that since he was indicted for Possession of a Deadly Weapon During the Commission of a Felo-

ny (Murder in the First Degree), separately indicted for four charges of Murder in the First Degree arising out of the use of a deadly weapon in two, and the perpetration of Robbery in the other two, and since the facts required to establish the Weapons and Robbery offenses require proof of the murders, the murders are lesser included offenses in the Weapons and Robbery charges.

In support of that contention, defendant cites 11 *Del.C.* § 206[3] and relies upon that part of this Court's opinion in *Mackie v. State*, Del.Supr., 384 A.2d 625 (1978) which states:

> We find ambiguity in the first sentence of § 206(b) when read in relation to § 206(a). In order to remove the ambiguity and give meaning and purpose to § 206 taken as a whole, we think the first sentence of § 206(b) must be read as follows: "A defendant may be convicted of an offense not charged in the indictment or information if included in an offense charged in the indictment or information." As so construed and applied in the instant case, § 206(a)(1) may have barred a separate conviction on the weapon-possession offense if it had not been separately charged in the indictment; but since the weapon-possession offense was separately charged in this indictment, a separate conviction thereupon, is proper under [*State v.*] *Honie* [Del. Supr., 310 A.2d 872]. Compare *Bremer v. State*, Md.App., 18 Md.App. 291, 307 A.2d 503 (1973); *Comm. ex rel. Curry v. Myers*, Pa.Super., 195 Pa.Super. 480, 171 A.2d 792 (1961); *United States v. Busic*, 3 Cir. [587 F.2d 577] (Jan. 5, 1978).

Taken out of context one might interpret that quote from *Mackie* as did the defendant. But, we hold that the Murder charges in this case are not lesser included offenses of the Weapons and Robbery offenses. In so holding, we apply the same rationale as we stated in *Whalen v. State*, Del.Supr., 434 A.2d 1346, 1357 (1980).

Applied literally, the above quoted language of § 206 might lead to the conclusion that Rape First Degree is a lesser included offense of Felony Murder (Rape), once the former may be 'established by the proof of the same or less than all the facts required to establish the commission of the' latter. However, we do not believe that the Legislature intended such a literal application. Prior to the enactment of § 206, this Court rejected the contention that the underlying felony is a 'lesser offense included in the greater crime of (felony) murder ...' *Jenkins v. State*, Del.Supr., 240 A.2d 146, 149 (1968), aff'd, 395 U.S. 213, 89 S.Ct. 1677, 23 L.Ed.2d 253 (1969). We find nothing in the provisions of § 206 or elsewhere in the Delaware Criminal Code which indicates an intention to legislatively overrule the *Jenkins* holding.

Moreover, the societal interests sought to be protected by the statutes here involved are entirely separate and distinct. The Rape statute seeks to protect women from sexual assault, while the Murder statute seeks to protect human life. Consequently, we believe that the Legislature intended to leave the *Jenkins* rule intact when enacting § 206, and we hold that Rape is not a lesser included offense of Felony Murder (Rape). Compare *Whalen v. United States, supra*, 445

---

**3.** 11 *Del.C.* § 206 reads in its pertinent part as follows:

> (a) When the same conduct of a defendant may establish the commission of more than 1 offense, the defendant may be prosecuted for each offense. The defendant's liability for more than 1 offense may be considered by the jury whenever the State's case against him for each offense is established in accordance with § 301 of this title. He may not, however, be convicted of more than 1 offense if:

> (1) One offense is included in the other, as defined in subsection (b) of this section; or

> \* \* \* \* \* \*

> (b) A defendant may be convicted of an offense included in an offense charged in the indictment or information. An offense is so included when:

> (1) It is established by the proof of the same or less than all the facts required to establish the commission of the offense charged; or ...

U.S. [684] at 712, 100 S.Ct. [1432] at 1449, 63 L.Ed.2d [715] at 730 (Rehnquist, J., dissenting). Therefore, we conclude that the Legislature did intend to authorize separate convictions and sentences for Felony Murder and the underlying Rape First Degree in this case.

The societal interests sought to be protected by the statutes here involved are entirely separate and distinct. The murder statute seeks to protect human life. The weapons' statute seeks to discourage the possession of a deadly weapon during the commission of a crime. The robbery statute seeks to protect people from the forcible taking of their property. Consequently, we conclude the General Assembly intended the Murder offenses and the underlying Weapons and Robbery offenses to be separate offenses, subject to separate convictions and sentences.

In *Evans v. State* (Evans I), Del.Supr., 420 A.2d 1186 (1980) this Court held that multiple sentences for Manslaughter, Assault in the Second Degree, and Possession of a Deadly Weapon During the Commission of those Felonies violated defendant's constitutional guarantees against Double Jeopardy under the Fifth Amendment. That decision tracked this Court's holding in *Hunter v. State*, (Hunter I), Del.Supr., 420 A.2d 119 (1980). The judgments in *Hunter* and *Evans* were reversed by the United States Supreme Court and remanded for further consideration in light of *Albernaz v. U.S.*, 450 U.S. 333, 101 S.Ct. 1137, 67 L.Ed.2d 275 (1981).[4] Upon reconsideration of *Hunter* I and *Evans* I in light of *Albernaz*, we held that since the General Assembly intended to impose separate sentences for the offenses involved even though factually the offenses were indivisible, multiple sentences for the offenses did not violate the Double Jeopardy Clause of the Fifth Amendment. *Hunter v. State*

(Hunter II), Del.Supr., 430 A.2d 476 (1981); *Evans v. State*, (Evans II), Del.Supr., 430 A.2d 481 (1981). In *Evans v. State*, Del. Supr., 445 A.2d 932, (1982) we extended the application of that holding to the Double Jeopardy Clause of the Delaware Constitution, Art. 1, § 8. In spite of defendant Flamer's plea that we arrive at a different result in this case, multiple sentencing in this case falls squarely within the settled law of this State unless the United States Supreme Court guides us otherwise in the future.

### III

■ Defendant contends his taped confession made at the police troop after he had been brought before the Justice of Peace Court, pursuant to the mandate of the arrest warrant and Justice of the Peace Criminal Rule 4, should be suppressed because he was under psychological custodial compulsion at the time, and it was obtained in violation of the Sixth and Fourteenth Amendments' guarantee of the assistance of counsel.[5] Defendant relies upon *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964) and its recent progeny. It is unquestioned that a criminal defendant is entitled to the assistance of counsel at all critical stages of the judicial process. But as the Supreme Court has stated:

There has occasionally been a difference of opinion within the Court as to the peripheral scope of this constitutional right. *See Kirby v. Illinois*, 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411; *Coleman v. Alabama*, 399 U.S. 1, 26 L.Ed.2d 387, 90 S.Ct. 1999. But its basic contours, which are identical in state and federal contexts, *Gideon v. Wainwright*, 372 U.S. 335, 9 L.Ed.2d 799, 83 S.Ct. 792, 23 Ohio Ops 2d 258, 93 ALR2d 733; *Argersinger v. Hamlin*, 407 U.S. 25, 32

---

4. *Delaware v. Hunter*, 450 U.S. 991, 101 S.Ct. 1689, 68 L.Ed.2d 190 (1981). *Delaware v. Evans*, 450 U.S. 991, 101 S.Ct. 1689, 68 L.Ed.2d 190 (1981).

5. This contention was raised by the Court *sua sponte*, the initial contention of defendant for suppression of the taped February 8, 1979 statement being based upon illegal detention and involuntariness.

L.Ed.2d 530, 92 S Ct 2006, are too well established to require extensive elaboration here. Whatever else it may mean, the right to counsel granted by the Sixth and Fourteenth Amendments mean at least that a person is entitled to the help of a lawyer at or after the time that judicial proceedings have been initiated against him—"whether by way of formal charge, preliminary hearing, indictment, information, or arraignment *Kirby v. Illinois,* [406 U.S.] supra, at 689, 32 L.Ed.2d 411, 92 S Ct 1877. See *Powell v. Alabama,* supra, [287 U.S. 45] 77 L.Ed. 158, 53 S Ct [55], 84 ALR 527; *Johnson v. Zerbst,* 304 US 458, 82 L.Ed. 1461, 58 S Ct 1019, 146 ALR 357; *Hamilton v. Alabama,* 368 US 52, 7 L.Ed.2d 114, 82 S Ct 157; *Gideon v. Wainwright,* supra; *White v. Maryland,* 373 US 59, 10 L.Ed.2d 193, 83 S Ct 1050; *Massiah v. United States,* 377 US 201, 12 L.Ed.2d 246, 84 S Ct 1199; *United States v. Wade,* 388 US 218, 18 L.Ed.2d 1149, 87 S Ct 1926; *Gilbert v. California,* 388 US 263, 18 L.Ed.2d 1178, 87 S Ct 1951; *Coleman v. Alabama,* supra.

*Brewer v. Williams,* 430 U.S. 387, 398–399, 97 S.Ct. 1232, 1239, 51 L.Ed.2d 424 (1977).

■ Assuming in this case for purpose of argument that the Sixth and Fourteenth Amendments right to counsel attached at the time of defendant's initial appearance before the Justice of the Peace as claimed, we first review the totality of the circumstances to determine if Flamer's conduct following his arrest and prior to the taking of the taped confession constituted a waiver of that right since:

It was incumbent upon the State to prove "an intentional relinquishment or abandonment of a known right or privilege." *Johnson v. Zerbst,* 304 US, at 464, 82 L.Ed. 1461, 58 S Ct 1019, 146 ALR 357. That standard has been reiterated in many cases. We have said that the right to counsel does not depend upon a request by the defendant, *Carnley v. Cochran,* 369 US 506, 513, 8 L.Ed.2d 70, 82 S Ct 884 *cf. Miranda v.*

*Arizona,* 384 US, [436] at 471, 16 L.Ed.2d 694, 86 S Ct 1602, [at 1626], 10 Ohio Misc 9, 36 Ohio Ops 2d 237, 10 ALR3d 974, and the courts indulge in every reasonable presumption against waiver, *e.g., Brookhart v. Janis, supra,* [384 U.S. 1] at 4 [86 S.Ct. 1245, 1246, 16 L.Ed.2d 314]; *Glasser v. United States,* 315 U.S. 60, 70 [62 S.Ct. 457, 464, 86 L.Ed. 680]. This strict standard applies equally to an alleged waiver of the right to counsel whether at trial or at a critical stage of pretrial proceedings. *Schneckloth v. Bustamonte,* 412 U.S. 218, 238–240 [93 S.Ct. 2041, 2053–2054, 36 L.Ed.2d 854]; *United States v. Wade,* 388 U.S., at 237 [87 S.Ct., at 1937].

*Brewer v. Williams, supra,* at 404, 97 S.Ct. at 1242.

The thrust of defendant's compulsion argument is that the mental coercion of the police interrogation and oppressive custodial presence, the wilful disregard of the Justice of the Peace Court's commitment order, and the modified "Christian Burial" speech had done their damage, and the Fifth Amendment warnings required by *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) and given defendant prior to taping his confession became a mere empty formality.

The modified "Christian Burial" speech referred to by defendant came within a matter of minutes after defendant's upset mother had left the police troop without any supportive communication with defendant. Corporal Porter testified at trial that the following exchange between himself and defendant occurred:

Detective Callaway walked on into the back room. So I went to the cell door and opened up the cell door and I was talking to him by myself, one-on-one, and I asked him, I said, "Do you believe in God?" and he said, "Yeah". I said, "Then you got to believe in heaven and hell, right?". He said "Yeah". I said, "Well, then you're going to burn in hell unless you get straight with me about what's happened today" or "what hap-

pened yesterday. I want you to tell me." I said, "You have to clear your conscience of what's going on" and this is when he started weakening up a little bit. He had some tears in his eyes and he said, "Okay. I'll talk to you." That's when I took him out of the cell.

At the Suppression Hearing Detective Porter testified to a completely different exchange as follows:

Flamer was placed in the cell and I was there in the hallway. He started saying, "Hey" like this. I walked over to the cell and I said, "Yeah". He said, "I want to talk to you." And I said, "Okay. Are you going to tell me the truth." He said, "Right". So I went around to the front office and got the key to the cell and got him out of the cell. Took him in the back office which would be the Detectives' office. It would be located on the northeast section of the building. Detective Brode was with me the whole time and it was at this time that Flamer gave me a statement.

■ There is no issue raised by defense counsel in this appeal of any physical or abusive tactics of the police during interrogation and custody although we are mindful and consider as a part of the totality of circumstances, the testimony of defendant as to his fear of retribution, the failure of the police to give him alcohol and cigarettes, to provide him with a warm comfortable place to sleep or permit him to call his mother. Assuming as we have that the Sixth and Fourteenth Amendments right to counsel attached in this case, we are also mindful that absent proof by the State of a knowing and intelligent relinquishment or abandonment of that right, there can be no waiver. Although defendant did not request counsel at any stage of his interrogation, the right to counsel does not depend upon a request for counsel. As a matter of federal constitutional law this defendant was entitled to legal representation during any interrogation following his arraignment, and the presumption against

waiver places a heavy burden on the State to overcome that presumption.

■ In our overview of the evidence adduced at the hearings before the Court on defendant's Motion to Suppress and before the Court and jury at trial, we see the defendant as a twenty-five year old male who reached the eleventh grade of school, a convicted felon, and one who at the outset informed the police he knew his rights. There is no contention that he was not on numerous occasions given his constitutionally required rights as set forth in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Nor is there any contention that defendant from the moment of arrest until contact was made with him through the Public Defender's office, ever attempted to invoke any of the *Miranda* rights. Instead, when confronted with the physical evidence seized by the police at his home, the blood on the coat he was wearing when he was arrested, the blood under his fingernails, and the articles belonging to the victim Byard Smith taken from one of his companions at the time of arrest, defendant volunteered fictitious stories of his complicity in the crimes while at the same time denying that he was guilty of killing anyone. He first told the police he was home asleep, that Andre Deputy aroused him, and that he went to the murder scene to help Deputy take the fruits of the murder to defendant's house. Defendant next told the police that he, Johnny Christopher and Andrew Deputy, had gone into the victims' home, and that it was Johnny who did the stabbing. In the entire record of this case there appears to be no time except initially when he claimed to be home asleep, that defendant denies his participation in the robberies and murders, although throughout, including the taking of his recorded statement, he steadfastly denies actually inflicting the fatal wound upon either victim. Neither is there any evidence in the record of this case that defendant was so religiously oriented that the modified "Christian Burial" speech had the effect upon this defendant as it did

upon the defendant in *Brewer v. Williams,* 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977). Keeping in mind also that in *Brewer* the defendant at the time of being given the "Christian Burial" speech was represented by counsel and the police had agreed to refrain from any interrogation of defendant, we are satisfied that *Brewer* is clearly inapposite to this case.

The confession given on tape by defendant adds little to what the police already knew about this case except to clarify defendant's actual participation and locate one of the murder weapons. The tape of defendant's confession is replete with previously verified detail, and the entire tenor of the interrogation as one listens to the tape evidences a voluntary trustworthy statement of truth and personal involvement in the heinous murder of defendant's own aunt and uncle by marriage. We are fully satisfied that defendant knowingly, intelligently and voluntarily waived any Sixth and Fourteenth Amendments right to counsel he might have had. Defendant's Fifth Amendment rights under *Miranda* are not under attack.

Since the defendant in this case has raised an issue with respect to the voluntariness of his taped confession of February 8, 1979, this Court *sua sponte* called for supplementary briefing and argument on the effect, if any, of the Trial Court's failure to follow the historical guidelines in Delaware of testing the voluntariness un-

der the Massachusetts rule commented upon favorably, but not as a constitutionally required rule of procedure in *Jackson v. Denno,* 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964). Under that rule, the judge hears all the evidence on voluntariness out of the presence of the jury before allowing a confession into evidence; if the judge finds the confession to have been made voluntarily the jury is instructed that although the confession has been admitted into evidence the jury must find from the facts adduced at trial that the confession was voluntarily given before it can be considered as evidence against the defendant.[6]

■ In this case, following the suppression hearing outside the presence of the jury, the Trial Judge ruled that all inculpatory statements made to the police by defendant after his arrest were admissible into evidence as being made freely and voluntarily without coercion. At trial, defendant noted a continuing objection to the admissibility of the statements but made no request of the Court to instruct the jury on the issue. The Court, however, did instruct the jury, inter alia, as follows:

You are the sole judge of the credibility of each witness, including the defendant, and of the weight to be given to the testimony of each. You should take into consideration each witness' means of knowledge, strength of memory and opportunity for observation, the reason-

[6] The following instruction on the issue of voluntariness is one generally given in this State.

The Court has admitted into evidence against each defendant a statement given by him. Each statement was admitted only against the person who made it. This statement should be considered against the person who made it, together with all other evidence against that same defendant, if you find that it was freely and voluntarily given, without duress or coercion, and free from promises or threats by others. Any statements of a defendant, written or oral, which were obtained by either mental or physical coercion, duress or intimidation, that is, any statements which are not the product of a free will, are not to be used as evidence against that defendant. It is for you to decide whether the statements are the products of a free will.

The degree of credit to be given to the statement is to be considered by you under the circumstances of the case. The whole of what the defendant who made the statement said on the subject at the time of making the statement should be taken together. You may believe that part which incriminates him and reject that part which is in his favor. Or you may believe so much as is in his favor and reject that which is against him, if you see sufficient grounds, upon all the evidence, for so doing. You are at liberty to judge of the statement, like any other evidence, from all of the proven circumstances of the case. *State v. Winsett,* Del.Super., 205 A.2d 510, 520–521 (1964).

ableness or unreasonableness of his testimony, the consistency or inconsistency of his testimony, the motives actuating him, the fact, if it is a fact, that his testimony has been contradicted, his bias, prejudice or interest, if any, his manner or demeanor upon the witness stand, and all other facts and circumstances shown by the evidence which affects the credibility of his testimony.

\* \* \* \* \* \*

If you find the testimony to be conflicting by reason of inconsistencies, it is your duty to reconcile it, if reasonably possible, so as to make one harmonious story of it all. But if you cannot do this, then it is your duty and privilege to give credit to that portion of the testimony which, in your judgment, is most worthy of credit and disregard any portion of the testimony which, in your judgment, is unworthy of credit. In so doing, you should take into consideration the demeanor of the witnesses as they testified before you, their apparent fairness in giving their testimony, their opportunities for learning and knowing the facts about which they testified, and any bias or interest that they may have concerning the outcome of this case.

Under the totality of the circumstances as we have stated them previously, we are satisfied that the Court committed no error in failing to follow historical precedent which in itself does not clearly enunciate or establish a requirement on the part of the Trial Court to submit specifically the factual issue of voluntariness to the jury particularly in the absence of a request. *See Lego v. Twomey*, 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972) (which held that a defendant does not have a constitutional right, after a trial judge has ruled adversely on his claim that his confession was involuntary, to have the jury decide the claim anew).[7]

## IV

■ Defendant contends the denial of his motion to suppress certain evidence seized as a result of a warrantless search of his residence violated his right against unreasonable search and seizure protected by the Fourth Amendment and Article I § 6 of the Delaware Constitution. Defendant claims the State failed to bear its burden of proving voluntary consent and authority to consent. Citing *Bumper v. North Carolina*, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968), defendant claims the State offered no proof that his elderly grandmother's consent to admit the officers into the residence was anything more than an unknowing, unintelligent acquiescence resulting from the sudden confrontation by police officers looking for her grandson. Additionally, it is asserted that no proof was offered by the State of the grandmother's authority to permit an entry into defendant's second floor room where the actual search and seizure of evidence was begun.

In considering this issue we must examine the totality of the circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).

Mrs. Benson, defendant's grandmother, owned the four-room residence which was occupied at the time by Mrs. Benson, defendant's father, Andre Deputy, and defendant. Mrs. Benson testified on behalf of defendant during the penalty phase of this case and indicated that defendant had

---

7. *See also* DRE 104(a), (c) which establishes clearly that preliminary questions concerning the admissability of evidence shall be determined by the Court, and that hearings on the admissibility of confessions shall in all cases be conducted out of the hearing of the jury. The Delaware Uniform Rules of Evidence had been promulgated by this Court two weeks prior to the trial of this case but were not effective at the time of trial. However, the now effective DRE 104(a), (c) crystallizes in this State that which historically has been unsaid emphatically and clearly. In the past there were those who opined that the Massachusetts rule permitted the jury to consider admissibility as well as weight. It is now clear that the jury has no part in the admissibility process and is limited to the jurors' determination of the weight and credibility they are to give a confession admitted into evidence.

lived with her all his life. But there is no evidence in the record that Mrs. Benson shared her right to control the entire premises with her grandson or anyone. Therefore, we are satisfied that defendant's contention is totally without merit. Mrs. Benson without hesitation or pressure by the police invited the officers into her home and freely permitted them access to the upstairs bedroom where defendant sometimes slept when the weather was not cold, as it was on the night in question. There is no evidence of any subterfuge by the police as in *Bumper v. North Carolina, supra.*, the evidence seized was in plain view once entrance was gained, and Mrs. Benson clearly had sufficient control of the premises to bind defendant by her consent under *Jenkins v. State,* Del.Supr., 230 A.2d 262 (1967).

### V

■ Defendant contends there was insufficient evidence to allow convictions on four counts of murder in the first degree when there are only two dead people. This argument is based upon the assertion that it was error to allow the jury to consider the two theories advanced by the State, i.e., intentional murder and felony murder. Defendant argues that one murder theory is included in the other, and that inconsistent findings of fact are required to establish the offenses.

Among other charges, defendant was indicted and convicted of four counts of Murder in the First Degree. Counts I and II allege that the defendant violated 11 *Del.C.* § 636(a)(1), which provides in pertinent part as follows:

(a) A person is guilty of murder in the first degree when:

(1) He intentionally causes the death of another person.

Counts III and IV allege that the defendant violated 11 *Del.C.* § 636(a)(2), which provides in pertinent part as follows:

(a) A person is guilty of murder in the first degree when:

(2) In the course of and in furtherance of the commission ... of a felony ... he recklessly causes the death of another person.

As can be seen, the defendant was indicted on four (4) counts in one indictment of violating 11 *Del.C.* § 636, murder in the first degree, but under different subsections of the statute. Subsection (1) requires the State to prove the defendant "intentionally" caused the death of another person. "Intentionally" is defined in pertinent part as follows:

(a) INTENTIONALLY—A person acts intentionally with respect to an element of an offense when:

(1) If the element involves the nature of his conduct or a result thereof, it is his conscious object to engage in conduct of that nature or to cause that result.

11 *Del.C.* § 231.

Subsection (2) requires the State to prove the defendant "recklessly" caused the death of another person, while committing or in the furtherance of, in the instant case robbery, a felony. "Recklessly" is defined in pertinent part as follows:

(c) RECKLESSLY—A person acts recklessly with respect to an element of an offense, when he is aware of and consciously disregards a substantial and unjustifiable risk that the element exists or will result from his conduct. The risk must be of such a nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation.

11 *Del.C.* § 231.

Defendant in claiming that he cannot be convicted on one charge of "intentionally" killing and a second charge of "recklessly" killing the same person, bases his argument on 11 *Del.C.* §§ 206(a)(1), (a)(3), (b)(1), (b)(3) which provide:

(a) He may not, however, be convicted of more than 1 offense if:

(1) One offense is included in the other, as defined in subsection (b); or

\* \* \* \* \* \*

(3) Inconsistent findings of fact are required to establish the commission of the offenses.

(b) A defendant may be convicted of an offense included in an offense charged in the indictment or information. An offense is so included when:

(1) It is established by the proof of the same or less than all of the facts required to establish the commission of the offense charged; or

\* \* \* \* \* \*

(3) It involves the same result but differs from the offense charged only in the respect ... a lesser kind of culpability suffices to establish its commission.

Defendant contends that each theory requires proof of the same or less than all the facts required for the other theory since both theories involve the same result with the only difference being the "quality of 'intention'" and that reckless killing is included in the intentional killing.

If state of mind were the only element, it would be true in this case that "intentional" is a higher state of mind than "reckless" and that the murders here fall within the ambit of intentional even though charged under the felony-murder theory. As Chief Justice Burger recently stated in *Hopper v. Evans*, 456 U.S. 605, 613, 102 S.Ct. 2049, 2054, 72 L.Ed.2d 367, 374 (1982):

It would be an extraordinary perversion of the law to say that intent to kill is not established when a felon, engaged in an armed robbery, admits to shooting his victim in the back in the circumstances shown here.

In final analysis what we must look at in our interpretation is the statutory "offense" not the facts of a given charge as defendant has here. The factor that elevates a reckless killing, under § 636(a)(2), to an equal plane with subsection (1), is the added element not required for subsection

(1), that the killing occur "in the course of and in furtherance of the commission or attempted commission of a felony or immediate flight therefrom." This is commonly known as the felony murder rule. In the present case that felony was robbery and subsection (2) is not included within subsection (1). Subsection (1), is conversely not included in subsection (2), because of the higher state of mind required for it as opposed to a felony murder theory. A charge under § 636(a)(2) is not a lesser included offense to a charge under § 636(a)(1) even though both charges arise out of the same incident and require proof of the same result. Neither is there anything inconsistent in charging defendant with both theories or with the jury believing defendant acted intentionally during the commission of the robbery, since a finding of intent obviously includes a finding of recklessness. 11 *Del.C.* § 253.

## VI

▆ Finally defendant contends there was insufficient evidence to allow a conviction of Robbery in the First Degree and two convictions of Murder in the First Degree with the Robbery being the underlying felony of the charges brought under the felony-murder theory of 11 *Del.C.* § 636(a)(2).

It is defendant's contention that the State did not meet its burden of proving beyond a reasonable doubt that defendant used force on the murder victims to overcome their resistence to the taking of their money.

Among other offenses, Flamer was convicted by the jury of Robbery First Degree in violation of 11 *Del.C.* § 832(a)(1) and two counts of Murder First Degree in violation of 11 *Del.C.* § 636(a)(2). Section 832(a)(1) reads as follows:

A person is guilty of robbery in the first degree when he commits the crime of robbery in the second degree and when, in the course of the commission of the crime or of immediate flight there-

from, he or another participant in the crime:

(1) Causes physical injury to any person who is not a participant in the crime; . . . .

Robbery Second Degree, necessary to Robbery First, is defined as follows:

A person is guilty of robbery in the second degree [8] when, in the course of committing theft, he uses or threatens the immediate use of force upon another person with intent to:

(1) Prevent or overcome resistance to the taking of the property or to the retention thereof immediately after the taking; or

(2) Compel the owner of the property or another person to deliver up the property or to engage in other conduct which aids in the commission of the theft. 11 *Del.C.* § 831.

Section 636(a)(2) reads:

A person is guilty of murder in the first degree when:

\* \* \* \* \* \*

(2) In the course of and in furtherance of the commission or attempted commission of a felony or immediate flight therefrom, he recklessly causes the death of another person, . . .

This section is a statement of the felony murder rule. Robbery was the underlying felony involved in this case.

Defendant claims the jury could only speculate on what happened. They could not have made a common sense, logical determination based on the evidence before them as to whether or not the Smiths were killed because they were resisting the taking of their money, or whether they were killed in a reckless frenzy or intentionally and then the perpetrator took their money.

On the other hand, the evidence of robbery is overwhelming as evidenced by the items seized by the police during their investigation of the murders, the circumstances of the killing as detailed through-

out this opinion, and as stated *inter alia* by defendant in his transcribed statement as follows:

A. Andre Deputy. He said are you going to do that thing and I said, What thing? He said, you know what we discussed. I said that robbing you call it. He said, yeah.

Q. Robbing who?

A. Mr. Byard. And I said, 'Man I don't know.'

A. Yeah and then he seen me stop and I was standing there shaking like this and looking at the blood and he and I did and I went over there like this stabbing her. Cause Uncle Byard come off the couch and then he already had her killed and then he threw him on the floor. That's when he got the wallets and money cause Uncle Byard had his pants on the what's you call it and she had her money in her pants and in her drawers or something.

Q. Just you and Andre? Who planned it? Whose idea was it to go over and rob them?

A. Andre.

Q. Were you planning on killing them from the beginning?

A. It wasn't suppose to have went?

Q. What way was it supposed to have went?

A. We were suppose to have stocking put over our heads.

Q. Put over your heads?

A. Uh huh.

Q. And were you going to hold them up?

A. Yeah.

Q. How do you think you would have been able to get this without your own relatives knowing who you were because they would have recognized your voice?

A. We were supposed to describe our voice.

Q. Supposed to what?

---

**8.** "A person is guilty of theft when he takes, exercises control over or obtains property of another person intending to deprive him of it or appropriate it." 11 *Del.C.* § 841.

A. Describe our voice. Andre said go ahead.

Q. You were going to put the stocking mask on your head right and you were going to go over there but you said you saw Andre pick up the knife in your house?

A. Uh huh.

\* \* \* \* \* \*

Q. Did you? So you two planned it? What night did you plan it, that very same night?

A. No we talked about that about a week ago.

Q. So you set in your house on Mispillion Street, your mother's house?

A. Andre was telling me how it should be done.

Q. Andre was telling you how it should be done? This was like a week before, right? And how did Andre say it should be done?

A. We was suppose to go in there and I was suppose to get the money while he held them off with the gun.

Q. Did you know when they were supposed to get the check?

A. Yeah, Andre said she got it on the 3rd or 1st.

Q. Did he have any idea how much the check would be?

A. No he didn't say he said Social Security should be around about at least $200.00.

Q. How did he know that it would be the 1st or 3rd of the month?

A. Cause my grandmom gets a Social Security check.

\* \* \* \* \* \*

A. Backseat. He also, Andre, took the shotgun with him and he didn't use that.

Q. Where is the shotgun?

A. It should be in the trunk where he put it.

Q. In the trunk of the car?

A. Yeah. I forgot all about it.

Q. Whose shotgun was that?

A. It was hisen I guess.

Q. Oh he took it with him when he went down to do this?

A. Yeah.

Q. He was going to use the shotgun?

A. Yeah.

Q. Did he take the shotgun in the house with him?

A. He hid it beside the building.

Defendant's argument that there is insufficient evidence in the record to convict defendant of Robbery is without merit.

\* \* \*

For the reasons stated the convictions and sentences are affirmed, with the exception of the mandatory death sentence imposed by the jury following the bifurcated penalty hearing.

Issues raised in this appeal pertaining to the death penalty are presently pending for final disposition by the Supreme Court of the United States. *See Zant v. Stephens*, 456 U.S. 410, 102 S.Ct. 1856, 72 L.Ed.2d 222 (1982); *Barclay v. Florida*, 463 U.S. 939, 103 S.Ct. 3418, 77 L.Ed.2d 1134 (1982). The majority of the Court, therefore, deems it advisable to withhold decision on the death penalty phase of this appeal until the United States Supreme Court has spoken. Jurisdiction is reserved as to death sentence. No mandate on any aspect of this appeal will issue until further order of the Court.[9]

## OPINION ON DEATH SENTENCE

The guilt phase of this case having been decided by this Court's Opinion dated February 7, 1983, we now turn to the defendant's assertions of error in his penalty hearing, held pursuant to 11 *Del.C.* § 4209. Before considering the particular allegations of reversible error which defendant contends occurred during the penalty phase of his trial, however, we find it necessary and helpful for later reference herein to set forth at the outset the historical back-

---

9. McNeilly, J. respectfully dissents as to withholding decision on the sentence of death.

ground of the statutory provisions relating to imposition of the death penalty in Delaware and to examine pertinent parts of defendant's penalty hearing. In so doing, we draw liberally from this Court's discussion of the present death penalty statute in *State v. White*, Del.Supr., 395 A.2d 1082, 1084–87 (1978).

In *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), the United States Supreme Court invalidated the capital punishment statute of Georgia because it gave sentencing juries virtually untrammeled discretion to impose the death penalty arbitrarily and capriciously without clear and objective standards and guidelines. The *Furman* decision effectively struck down most, if not all, of the state capital punishment statutes then existing. The Delaware Legislature responded to *Furman* in 1974 by re-defining the crime of First Degree Murder and requiring the imposition of the death penalty for that crime. This Court upheld the constitutionality of Delaware's 1974 mandatory death penalty statute based upon its understanding of *Furman* in *State v. Sheppard*, Del.Supr., 331 A.2d 142 (1974).

Two years later, however, the United States Supreme Court had occasion to pass upon the constitutionality of several revised state capital punishment statutes in *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); *Proffitt v.* *Florida*, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976); *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976); *Woodson v. North Carolina*, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976); and *Roberts v. Louisiana*, 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed. 974 (1976). The mandatory death penalty statutes in *Woodson* and *Roberts* were declared unconstitutional, while the discretionary death penalty laws in *Gregg, Proffitt*, and *Jurek* were upheld because they "suitably directed and limited [the discretion of the sentencing jury] so as to minimize the risk of wholly arbitrary and capricious action." *Gregg*, 428 U.S. at 189, 96 S.Ct. at 2932. The statutes which passed muster in *Gregg, Proffitt* and *Jurek* contained three common hallmarks: a) a bifurcated trial for separate determination of guilt and punishment; b) a required finding of certain aggravating circumstances and consideration of existing mitigating circumstances as a pre-requisite to imposition of the death penalty; and c) expedited appellate review of all death sentences.

The holdings in *Woodson* and *Roberts* compelled this Court in *State v. Spence*, Del.Supr., 367 A.2d 983 (1976) to declare Delaware's 1974 mandatory death penalty statute unconstitutional. Reacting almost immediately to this flurry of judicial activity, the Delaware General Assembly enacted 11 *Del.C.* § 4209, this State's current death penalty statute (Statute) [1], patterning

---

1. For the provisions of 11 *Del.C.* § 4209, *see* Appendix A. *infra.*

Except for a brief period between 1958 and 1961, Delaware has long required the death penalty for certain kinds of murder. In the first codification of Delaware law, the death penalty was mandatory for any person convicted of murder with express malice aforethought or murder while perpetrating or attempting to perpetrate any crime punishable by death. Revised Code of Delaware ¶ 4697 (1915). Treason, rape and kidnapping were crimes punishable by death at the time. The same provisions were retained in later Code revisions. *See* Revised Code of Delaware ch. 149, ¶ 5157, § 1 (1935); 11 *Del.C.* § 571 (1953). In 1958 the Legislature amended the Code by abolishing capital punishment for all crimes formerly punishable by death. 51 Del. Laws ch. 347 (1958).

It is interesting to note at this point that on October 31, 1961 an elderly couple was killed by blasts from a shotgun as they passed the time of day in their farm home near Laurel in Sussex County. In that case there was evidence of robbery and rape and no evidence of possible provocation. For no other known reason the General Assembly was called into special session and effective December 18, 1961, the bill restoring mandatory capital punishment for First Degree Murder became law without the approval of the Governor and in accordance with Section 18, Article 3 of the Constitution of Delaware.

In 58 Del.Laws ch. 497, § 4209 (1973) the Legislature again amended the death penalty statute to allow for sentence of either life imprisonment or death for First Degree Murder. In 1974 the General Assembly amended the statute to require only the death penalty

it after the Georgia statute deemed constitutional in *Gregg.*

The Delaware General Assembly in § 4209 prescribed a bifurcated trial procedure for First Degree Murder cases. *Id.* § 4209(b). In the first phase, the judge or jury must decide whether a defendant is guilty or innocent of First Degree Murder in violation of 11 *Del.C.* § 636.[2] *Id.* § 4209(b)(1). If the defendant is found guilty, a separate hearing is conducted before the same judge or jury that convicted the defendant to determine whether the defendant should be sentenced to death or life imprisonment without benefit of probation or parole or other reduction in sentence. *Id.* Procedure at such "punishment hearing" is governed by § 4209(c). At the hearing, the parties may present evidence "as to any matter that the Court deems relevant and admissible to the penalty to be imposed." *Id.* § 4209(c)(1). The evidence must "include matters relating to any mitigating circumstance and to any aggravating circumstance, including, but not limited to, those aggravating circumstances enumerated in 4209(e)." *Id.* Written notice of any aggravating or mitigating circumstances to be relied upon at the penalty hearing must be given to the other party prior to the punishment hearing unless the Court deems such advance notice impracticable. *Id.* The record or absence of any prior criminal convictions, guilty pleas or pleas of *nolo contendere* are admissible. *Id.* At the hearing, both parties are permitted to argue as to the punishment to be meted out. *Id.* § 4209(c)(2). After evidence is presented and oral arguments made, the judge must direct the jury "to weigh and consider any mitigating circumstances or aggravating circumstances and any of the statutory aggravating circumstances set forth in § 4209(e)." *Id.* § 4209(c)(4). The jury shall be instructed to weigh any mitigating factors against the aggravating factors. *Id.*

The death penalty may not be imposed unless the judge or jury finds at least one statutory aggravating circumstance beyond a reasonable doubt and unanimously recommends the death penalty after considering the circumstances and details of the crime and the character and propensities of the offender, and after weighing pertinent aggravating and mitigating factors. *Id.* § 4209(d)(1) a. & b. "A finding by the jury of a statutory aggravating circumstance, and a consequent recommendation of death, supported by the evidence, shall be binding on the Court." *Id.* § 4209(d)(1)b. If the sentencing body cannot unanimously find the existence of at least one statutory aggravating circumstance and cannot unanimously recommend the death penalty, then the Court must sentence the defendant to life imprisonment without benefit of parole or probation. *Id.* § 4209(d)(3).

Subsection (e) of the Statute contains a list of nineteen aggravating circumstances, at least one of which must be found unanimously beyond a reasonable doubt by the jury or judge in order for the death penalty to be imposed. *Id.* § 4209(e)(1).[3] If the defendant is convicted of First Degree Murder in violation of § 636(a)(2)–(7)[4], *supra,* such conviction conclusively establishes the existence of a statutory aggravating factor and the jury must be so instructed; but the jury is not precluded from considering and finding any of the other statutory aggravating circumstances and any other non-statutory aggravating circumstances supported by the evidence. *Id.* § 4209(e)(2).

for First Degree Murder and, in the event that the mandatory death penalty provision was later declared unconstitutional, life imprisonment. 59 Del.Laws ch. 284, § 4209 (1974). 11 *Del.C.* § 4209 contains Delaware's existing death penalty statute as amended in 61 Del. Laws ch. 41, § 4209 (1977).

**2.** For the provisions of 11 *Del.C.* § 636, *see* Appendix B. *infra.*

**3.** For the provisions of 11 *Del.C.* § 4209(e)(1), *see* Appendix A *infra.*

**4.** For the provisions of 11 *Del.C.* § 636(a)(2)–(7), *see* Appendix B *infra.*

In accordance with the practice sanctioned in the *Gregg* line of cases, the Statute mandates automatic review of any death penalty by this Court. *Id.* § 4209(g)(1). This Court must answer two questions in its review:

a. Whether, considering the totality of evidence in aggravation and mitigation which bears upon the particular circumstances or details of the offense and the character and propensities of the offender, the death penalty was either arbitrarily or capriciously imposed or recommended, or disproportionate to the penalty recommended or imposed in similar cases arising under this section; [and]

b. Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in subsection (e) of this section and, where applicable, § 636(a)(2)–(7) of this title. *Id.* § 4209(g)(2) a & b.

Review of the death penalty is based upon the transcript of the punishment hearing, which is transmitted to this Court by the Clerk of the Superior Court, and the briefs submitted by the parties. *Id.* § 4209(g)(1) & (3). Review under § 4209(g) is in addition to that conducted under ordinary appellate procedures. *Id.* § 4209(h).

Responding to an accused's delineation of several constitutional deficiencies in § 4209, this Court in *White, supra,* supplemented the Statute with several additional procedural requirements. Those requirements were: a) "A complete transcript of the trial must accompany transmittal of the transcript of the punishment hearing ...;" b) "An essential part of the record and of the report by the Trial Judge shall be a specific identification of the statutory aggravating circumstance or circumstances 'found' by the trier of fact;" c) A report by the Trial Judge, containing specified information about the defendant, the offense, the trial, the victim, defendant's counsel, and the chronology of the case;[5] and d) Counsel for the State and Court-designated *amicus curiae* are to furnish this Court with such assistance as the Court may request to aid it in conducting its review. *White,* 395 A.2d at 1096.

I

To fulfill the requirements of § 4209, a penalty hearing was conducted below to determine defendant's sentence. The State presented its opening argument first, seeking the death penalty based upon the alleged existence of four statutory aggravating circumstances: a) "The murder was committed while the defendant was engaged in the commission of, or attempt to commit, or flight after committing or attempting to commit ... robbery ...;" *Id.* § 4209(e)(1)(j) & (e)(2); b) "The defendant's course of conduct resulted in the deaths of 2 or more persons where the deaths are a probable consequence of the defendant's conduct"; *Id.* § 4209(e)(1)(k); c) "The murder was outrageously or wantonly vile, horrible or inhuman"; *Id.* § 4209(e)(1)(n); and d) "The murder was committed for pecuniary gain;" *Id.* § 4209(e)(1)(p). In the defendant's opening statement, counsel indicated that defendant would present reports by a psychologist and a psychiatrist and testimony by himself, his mother and grandmother in mitigation of his crimes. The mitigating factors which defendant intended to show were: a) his voluntary intoxication at the time of the offenses; b) defendant's actions did not constitute the sole cause of the victim's deaths; c) his "low mentality"; d) his unstable lifestyle; and e) defendant's non-liability for the actions of his co-defendant.[6]

---

**5.** For a copy of Flamer's report, *see* Appendix C. *infra.* Since Flamer's case was one of the earlier cases under the new statute, counsel met with the Trial Judge in Chambers to review the report. Today, written comments are often submitted by counsel.

**6.** Counsel for defendant did not explicitly refer to these mitigating factors at the penalty hearing, preferring to let the jury draw its own conclusions from the testimony of the witnesses. Counsel for each side filed lists of aggravating and mitigating factors to be relied upon at the penalty hearing pursuant to 11 *Del.C.* § 4209(c)(1).

After the opening statements, the State introduced into evidence, without objection, defendant's certified criminal record showing two felony convictions for forgery. Counsel for the State then declared that the "State will rely at this point on all the evidence developed at trial, and we rest for purposes of the penalty hearing." Defense counsel moved for an end to the penalty hearing on the ground that the State had failed to introduce any evidence to show the existence beyond a reasonable doubt of at least one of the aggravating circumstances listed in § 4209. The State argued that defendant's conviction for felony murder under § 636(a)(2) established the existence of the one statutory aggravating circumstance, and that it would be unreasonable to require the State to put on its whole case again for the purpose of the penalty hearing. The Trial Judge denied the motion.

Defense counsel then called the defendant to the stand. Defendant testified that he was divorced with one child, that he supported himself through odd-jobs, that he had a drinking problem, and that he had been drinking heavily on the day of the murders. Counsel for defendant then introduced the two psychological and psychiatric reports about defendant.

The defense's next witness was the defendant's mother, Mildred Smith. Mrs. Smith testified that her son had dropped out of high school and began to drink "quite a lot", that he was "no problem until he gets drinking", and that he had difficulty finding a job because of his criminal record.

The defense also called Mrs. Florence Benson, defendant's grandmother. She testified that defendant was "a good boy" and that he did not bother her when he was drinking.

After counsel presented brief summations, the Trial Judge instructed the jury in accordance with the provisions of § 4209. In particular, the Judge instructed the jury that since defendant was convicted of Felony Murder in violation of § 636(a)(2), the existence of one statutory aggravating circumstance—§ 4209(e)(1)(j)—was already established beyond a reasonable doubt. The Trial Judge also informed the jury that in weighing the factors in aggravation and mitigation of the crime, it could also consider, in addition to the statutory aggravating circumstances, any relevant non-statutory aggravating factors.

Following the instructions, the defendant objected to that part of the charge relating to statutory aggravating circumstance § 4209(e)(1)(j)—"The murders were outrageously or wantonly vile, horrible or inhuman"—on the ground that it was unconstitutionally vague. The Trial Court noted defendant's objection.

The jury then deliberated and unanimously recommended the death penalty for defendant for all four counts of murder. The jury submitted written interrogatories as documentation of its findings and recommendations.

Defendant moved to set aside the sentence of death on the ground that the State did not produce evidence at the penalty hearing to show the existence of a statutory aggravating circumstance beyond a reasonable doubt, and that defendant's conviction on four counts of murder when only two people were killed weighed prejudicially on the minds of the jurors at the penalty hearing. The Trial Judge denied the motion. We now focus on defendant's numerous points of appeal.

## II

The defendant argues that the Trial Court erred in allowing the jury to consider and find the statutory aggravating circumstances listed in § 4209(e)(1)(k), (n) & (p) because the State submitted no evidence supporting such circumstances at the penalty hearing. In arguing that the State was required to present evidence at the penalty hearing to support the aggravating factors and not rely on evidence admitted at the guilt phase, defendant relies on several passages in our Statute to the effect

that at the penalty hearing the "evidence shall include matters relating ... to any aggravating circumstance ... 11 *Del.C.* § 4209(c)(1) [and] [m]oreover, the instructions to the jury are to include only aggravating circumstances 'which may be raised by the evidence' 11 *Del.C.* § 4209(c)(4)." We find no merit to defendant's claim.

In *Eberheart v. State,* Ga.Supr., 232 Ga. 247, 206 S.E.2d 12, 17 (1974), the Supreme Court of Georgia examined the Georgia statute and concluded that it did not bar the sentencing jury from considering matters heard during the guilt phase of trial. Based on the similarity of our Statute with Georgia's, we reach the same conclusion.

Close scrutiny of our Statute discloses no language which prohibits the sentencing jury below from considering in the penalty phase evidence which it heard already at the liability phase.[7] To require the State to parade before the jury for a second time the same evidence which it earlier had occasion to review would not serve the interests of judicial economy. Moreover, it would be anomalous for this Court to conduct its review of a death penalty based upon the same evidence presented during both phases of the trial as we would be required to do by Statute, if the sentencing jury is strictly confined to consideration of evidence presented during the penalty phase. Defendant's reading of the Statute would prove unworkable.

Defendant suffered no prejudice from the State's reliance upon evidence from the guilt phase. Indeed, the use of such a procedure by the State might favor the defendant because reintroduction of evidence supporting the statutory aggravating factors at the penalty hearing would reinforce and place undue emphasis upon the circumstances of the murder in the jurors' minds.

### III

■ Defendant next argues that the Trial Court erred in instructing the sentencing jury to consider as two separate statutory aggravating circumstances a) that the murder was committed for pecuniary gain; § 4209(e)(1)(p); and b) that the murder occurred during commission of a robbery; § 4209(e)(1)(j) & (e)(2). The defendant theorizes that murders committed during a robbery are murders necessarily done for pecuniary gain, that these statutory aggravating factors are duplicitous, and that the Trial Court's instructions to the jury to weigh both factors prejudiced the defendant because duplicate aggravating circumstances were placed on the hypothetical balance scale.

In *Provence v. State,* Fla.Supr., 337 So.2d 783 (1976), *cert. denied,* 431 U.S. 969, 97 S.Ct. 2929, 53 L.Ed.2d 1065 (1977), relied upon by the defendant, the Florida Supreme Court vacated a death sentence based on its determination that two similar statutory aggravating circumstances were duplicative and that a murderer's pecuniary motives are but one factor for jurors to consider. The State points out a number of factors which weaken the import of *Provence.* First, although the *Provence* jurors recommended a life sentence, the Trial Judge overruled their decision and imposed the death penalty. The Trial Judge, however, neglected to specify which statutory aggravating circumstances he relied upon in sentencing the convict to death. Second, the *Provence* Court made no reference to the United States Supreme Court's opinion in *Gregg* which acknowledged that the jurors there had relied upon the same statutory aggravating circumstances characterized as duplicative by defendant and which affirmed the death sentence imposed by the Georgia jury, thereby sanctioning the constitutionality of the statutory system under which the defendant was sentenced. Third,

---

**7.** We limit our holding to the situation in which the sentencing jury is the same jury which convicted a defendant. Section 4209(b)(1) contemplated the possibility that a separate and new jury be impanelled if the convicting jury cannot participate in the hearing. In the latter situation, we would require both parties to introduce evidence to support the existence of any aggravating or mitigating circumstances which they seek to prove.

the Florida Supreme Court, in several post *Provence* decisions, has affirmed the death penalty where, as here, the two allegedly duplicate statutory aggravating circumstances were found in addition to other aggravating factors and where mitigating factors were presented for the jury's consideration. See *Jacobs v. State,* Fla.Supr., 396 So.2d 1113, 1119 (1981); *Fleming v. State,* Fla.Supr., 374 So.2d 954, 957–58 (1979); *Hargrave v. State,* Fla.Supr., 366 So.2d 1, 5 (1978), *cert. denied,* 444 U.S. 919, 100 S.Ct. 239, 62 L.Ed.2d 176 (1979). Consequently, we decline to follow the rationale of *Provence* and find no prejudice to defendant. *Accord, Arizona v. Rumsey,* ── U.S. ──, 104 S.Ct. 2305, 81 L.Ed.2d 164 (1984).

### IV

■ Another point of appeal advanced by the defendant is that the jury improperly relied upon a statutory aggravating circumstance which it did not find to exist beyond a reasonable doubt. More specifically, the defendant argues that the interrogatories given to the jury at the close of the penalty hearing just prior to their deliberations did not contain a question requiring the jury to "find" explicitly that the murder was committed during the course of a robbery.

In the four identical interrogatories prepared for each of the four counts of murder, the jurors were asked three questions:

1. Does the jury unanimously find that the following statutory aggravating circumstance or circumstances exist?

(a) The defendant's course of conduct resulted in the deaths of two or more persons where the deaths are a probable consequence of the defendant's conduct?

(b) The murder was outrageously or wantonly vile, horrible or inhuman?

(c) The murder was committed for pecuniary gain?

2. Does the jury unanimously recommend that a sentence of death be imposed?

3. If the jury unanimously recommends that a sentence of death be imposed, please indicate which statutory aggravating circumstance or circumstances were relied upon.

(a) The murder was committed while the defendant was engaged in the commission of robbery;

(b) The defendant's course of conduct resulted in the deaths of two or more persons where the deaths are a probable consequence of the defendant's conduct;

(c) The murder was outrageously or wantonly vile, horrible or inhuman;

(d) The murder was committed for pecuniary gain.

After each question, a space was provided for the jurors to check either "yes" or "no". The jurors unanimously checked "yes" for all questions and statutory aggravating circumstances. Question number one did not contain the statutory aggravating circumstance that the murder was committed during the course of a robbery.

In *White, supra,* this Court required, *inter alia,* that there be "a specific identification of the statutory aggravating circumstance or circumstances 'found' by the trier of fact, upon the basis of which the death sentence was imposed...." *White,* 395 A.2d at 1095. That requirement was properly satisfied in the instant case because the jurors explicitly identified under question number three the four statutory aggravating circumstances upon which they based their sentence, including the circumstance pertaining to murder during commission of robbery. Defendant's argument that the interrogatories were defective for lack of a subpart of question one requiring the jurors to find specifically that the murder was committed during a robbery is specious. The Trial Judge had previously instructed the jury in accordance with § 4209(e)(2) that defendant's conviction for felony murder under 11 *Del.C.* § 636(a)(2), *supra,* already established the existence of a statutory aggravating circumstance.

Thus, the jurors were not required to "find" under question number one a statutory aggravating circumstance which was already established by operation of § 4209(e)(2).

## V

Defendant contends further that the Trial Court erred in instructing the jury that one of the statutory aggravating circumstances, namely, murder during commission of a robbery, had been established beyond a reasonable doubt by virtue of defendant's conviction for felony murder under 11 *Del. C.* § 636(a)(2). Defendant asserts that such an instruction is unconstitutional in that it establishes a conclusive presumption and obviates the requirement that the State prove the existence of that particular aggravating circumstance beyond a reasonable doubt. We disagree.

Pursuant to § 4209(e)(2), the Trial Judge instructed the sentencing jury as follows:

> In this regard an applicable portion of the Delaware law provides that in any case where the defendant has been convicted of murder in the first degree in violation of 11 Delaware Code, Section 636(a)(2) that conviction shall establish the existence of a statutory aggravating circumstance.

> In this case the defendant has been convicted of violating 11 Delaware Code, Section 636(a)(2) which reads: "Murder in the first degree. A person is guilty of murder in the first degree when in the course of and in furtherance of the commission of a felony, he recklessly causes the death of another person.

> Therefore, that statutory aggravating circumstance has been established beyond a reasonable doubt, and you are so instructed.

As we said in Part II of this opinion, there is no constitutional or statutory requirement that the State meet its burden of proving the existence of statutory aggravating circumstances only with evidence adduced at the penalty phase. The jury's verdict after the guilt phase established, as a matter of law, that defendant was guilty beyond a reasonable doubt of murder during commission of a robbery. It is not necessary for the State to prove this fact a second time at the penalty hearing. To so require would be an abject waste of time.

██ Defendant also argues, alternately, that § 4209(e)(2) authorizes the instruction given here only when a defendant is convicted of felony murder or any of the other types of first degree murder under 11 *Del. C.* § 636(a)(2)–(7) and not when a defendant is convicted of intentional murder under § 636(a)(1). In the instant case, defendant was convicted, *inter alia,* of two counts of intentional murder, § 636(a)(1), and two counts of felony murder, § 636(a)(2). Thus, argues defendant, the State was not entitled to rely on the above instruction to establish that the murder was perpetrated during a robbery for the two counts of intentional murder under § 636(a)(1). Defendant claims that the State was required to present evidence at the penalty hearing and prove beyond a reasonable doubt the existence of the aggravating circumstance contained in § 4209(e)(1)(j)—that "[t]he murder was committed while defendant was engaged in the commission of ... robbery"—to support the death penalty for the two counts of intentional murder under § 636(a)(1).

Whether defendant's technical argument is correct is of little consequence here. Following the penalty phase of the trial, the jury identified as one of the four statutory aggravating circumstances upon which it based its sentence of death that the murder happened during a robbery. Under our Statute, this finding may serve as a statutory aggravating circumstance for the two counts of felony murder (§ 636(a)(2) by virtue of the instruction required under § 4209(e)(2) ) and as a statutory aggravating circumstance for the two counts of intentional murder (§ 636(a)(1) by virtue of § 4209(e)(1)(j) ).

## VI

As another ground for vacation of his death sentence, defendant urges that the

instructions given by the Trial Court were defective in that they did not make it sufficiently clear to the jurors that they could still recommend a life sentence even though they found the existence of a statutory aggravating circumstance. Defendant claims that the vagueness of the instructions on this point failed to channel the jury's discretion in imposing sentence.

As a general rule, a defendant is not entitled to a particular instruction, but he does have the unqualified right to a correct statement of the substance of the law. *Miller v. State*, Del.Supr., 224 A.2d 592, 596 (1966). A trial court's jury charge will not serve as grounds for reversible error if it is "reasonably informative and not misleading, judged by common practices and standards of verbal communication." *Baker v. Reid*, Del.Supr., 57 A.2d 103, 109 (1947). *See also, Haas v. United Tech. Corp.*, Del.Supr., 450 A.2d 1173, 1179–80 (1982); *Storey v. Castner*, Del. Supr., 314 A.2d 187, 194 (1973). In evaluating the propriety of a jury charge, the entire instruction must be considered with no statement to be viewed in a vacuum. *Haas, supra; Baker*, 57 A.2d at 109; *Spahn v. People's Ry. Co.*, Del.Supr., 92 A. 727, 729 (1912). While "some inaccuracies and inaptness in statement are to be expected in any charge," *Baker*, 57 A.2d at 109, this Court will reverse if the alleged deficiency in the jury instructions "undermined ... the jury's ability to 'intelligently perform its duty in returning a verdict.' " *Newman v. Swetland*, Del.Supr., 338 A.2d 560, 562 (1975), *quoting Storey*, 314 A.2d at 194.

We have carefully scrutinized the six and one-half pages of jury instructions in the transcript and conclude that the jury charge constituted a correct statement of the substance of the law of sentencing in First Degree Murder cases and was not so deficient that it rises to the level of reversible error. On numerous occasions during the instructions, the jurors were advised to weigh all factors in aggravation and mitigation of the crime. They were advised

that they could not impose a sentence of death unless they found beyond a reasonable doubt at least one statutory aggravating circumstance and unanimously recommended a sentence of death after weighing all relevant evidence on aggravation and mitigation of the crime and the particular characteristics and propensities of the defendant. The Trial Judge prefaced his jury charge with the statement that the penalty hearing was being conducted "to determine whether the defendant shall be sentenced to death *or* life imprisonment." (emphasis added). Although the Trial Court did not instruct the jury explicitly that it could still recommend life imprisonment despite finding the presence of a statutory aggravating circumstance, we believe that the charge, viewed *in toto*, adequately apprised the jurors that a finding of a statutory aggravating circumstance did not automatically require them to recommend the death penalty and that life imprisonment was an available alternative.

## VII

Defendant's next contention also addresses alleged defects in the jury charge. In his instructions, the Trial Judge mentioned twice that the jury's finding of a statutory aggravating circumstance and recommendation of death would be binding on the Trial Court if supported by the evidence. Defendant contends that the charge had the potential to suggest to the jurors that they could take their sentencing duty lightly and pass onto the Trial Court their solemn responsibility of determining whether defendant should live confined forever or die.

Defendant relies principally on two Georgia cases. *Fleming v. State*, Ga.Supr., 240 Ga. 142, 240 S.E.2d 37 (1977) and *Prevatte v. State*, Ga.Supr., 233 Ga. 929, 214 S.E.2d 365 (1975). In both cases, the prosecutor mentioned to the jury in his arguments during the punishment hearing that any death sentence was reviewable by the Trial Court and by the Georgia Supreme Court. The Georgia Supreme Court reversed the

jury's sentence of death in both cases. The *Fleming* Court reasoned that:

this type of remark has an unusual potential for corrupting the death sentencing process.... The jury is given the heavy burden of making the decision of whether the defendant will live or die. Comments about appellate safeguards on the death penalty suggest to the jury that they can pass the responsibility for the death sentence on to this Court.
*Fleming*, 240 S.E.2d at 40.

The *Prevatte* Court's rationale was similar:

[T]he inevitable effect of the prosecutor's remarks to the judge in the jury's presence was to encourage the jury to attach diminished consequence to their verdict, and to take less than full responsibility for their awesome task of determining life or death for the prisoners before them.
*Prevatte*, 214 S.E.2d at 367.

The relevant portions of the instructions assailed by defendant read as follows:

A finding by the jury of a statutory aggravating circumstance, and a consequent recommendation of death, supported by the evidence, shall be binding on the Court.

\* \* \* \* \* \*

Your unanimous recommendation for the imposition of the death penalty, if supported by the evidence, is binding on the Court.

Defendant would have this Court believe that these passages effectively caused the jurors to adopt a lackadaisical attitude toward their job of imposing sentence and to shift their sentencing task from themselves to the Trial Court. Our reading of these passages differs.

We doubt that the instructions engendered in the jurors a feeling that they could do a slipshod job of sentencing without worry because they knew that the Trial Court could correct any of their mistakes. The Trial Court did not remind the jury, as the prosecution did in *Fleming* and *Prevatte*, that their verdict was subject to review by both the Trial Court and this Court. Instead, the instructions informed the jury that its decision had to be based upon the evidence and would be binding if supported by the evidence. We read nothing further into these straightforward instructions.

### VIII

■ Defendant argues that the Trial Judge committed reversible error in failing to sequester the jury during the four day interim between the guilt and penalty phase of the trial and in failing to examine the jury as to any media exposure or other outside influence. Defendant bases his argument on sequestration upon § 4209(b)(1). That section provides:

Alternate jurors shall not be excused from the case prior to submission of the issue of guilt to the trial jury and shall remain separately sequestered until a verdict of guilt is entered. *Id.*

Defendant argues that since sequestration is expressly mandated in the Statute for alternate jurors, it is implicit in that provision that the whole jury be sequestered until a sentence is fixed. Defendant's construction of § 4209(b)(1) is erroneous.

■ In our view, the purpose of this provision is merely to ensure that the alternate jurors be sequestered away from the primary jurors while they are deciding the question of guilt. Moreover, sequestration is a matter of judicial discretion. *Bailey v. State*, Del.Supr., 363 A.2d 312, 319 (1976); Super.Ct.Crim.R. 24(f). Unless the defendant can show actual prejudice, there is no reversible error. *Bailey, supra.* The defendant has not demonstrated any prejudice. A bald assertion that he was somehow prejudiced merely because the record did not affirmatively reflect that the jury was uncorrupted by outside influence is insufficient as a basis for reversal.

■ As to defendant's claim that because the jury was not sequestered the Trial Judge should have examined the jury to discover whether they had been influ-

enced in any way, we are likewise unpersuaded. At the end of the guilt phase of trial, the Trial Judge expressly cautioned the jurors with this language:

> It is important [that] the same instructions still apply until the completion of the so-called penalty hearing: Do not discuss the case with anyone or allow anyone to discuss the case with you and if anyone should attempt to do so, you should report it to me upon your return. The same specific instructions: Do not read any newspaper accounts pertaining to this case, do not read any newspapers, do not listen to any radio broadcasts or TV broadcasts.

And again before the noon recess, just prior to counsels' summations at the penalty phase, the Trial Judge warned:

> During the noon recess, you are not to discuss the case with anyone, [or] allow anyone to discuss the case with you. If anyone should attempt to do so, you should report it to me upon your return.

Superior Court jurors are also routinely given a copy of the "Handbook for Petit Jurors Serving on the Superior Court of the State of Delaware" (Handbook). Portions of that Handbook, which we quote, are relevant here:

> Jurors are expected to use all the experience, common sense and common knowledge they possess. But they are not to rely on any private source of information. Thus, they should be careful at home or elsewhere. A fact that a juror gets from a private source may be only half true. It may be a fact that can be explained or perhaps the law of evidence requires it should have no influence on the outcome. At any rate, it is only fair that the parties have a chance to know and explain or answer any facts that matter in the case.

> Jurors must not talk about the case with others not on the jury and must not read about the case in the newspapers. They should avoid radio and television broadcasts that might mention the case. The jury's verdict must be based on noth-

ing else but the evidence before the Court.

> Breaking these rules is likely to confuse a juror. It may be hard to separate in a person's mind the court testimony and reports coming from other sources and such outside reports may be baised or inaccurate.

Handbook, at 20–21.

The presumption that jurors will read the Handbook is at least as great as any possibility that they will read the proscribed newspaper articles. *State v. Halko*, Del. Supr., 193 A.2d 817, 832 (1963). As we observed in *Smith v. State*, Del.Supr., 317 A.2d 20 (1974), it may fairly be assumed that jurors will follow instructions to avoid exposure to outside influences. *Id.* at 23. The cautionary instructions read by the Trial Judge, coupled with those contained in the Handbook were adequate safeguards against possible infectious external influences. Defendant could have polled the jurors on the opening day of the punishment hearing to discover whether they had been influenced. *But cf., Hughes v. State*, Del.Supr., 437 A.2d 559 (1981) [where this Court deemed that the Trial Court abused its discretion when it did not sequester the jury after deliberations based upon this Court's view that "[t]he reasons given by the Trial Judge ... ('too expensive'; 'too inconvenient around here'; 'we have to hire school buses and it is a mess') do not reflect the requisite consideration of the factors which should have governed the exercise of discretion on the issue of sequestration ...".

■ Defendant argues as another basis for vacation of his sentence that the Trial Court's failure to require that the entire trial including sidebar conferences be transcribed creates an insufficient record and, therefore, prevents this Court from making its required review. The State counterasserts that the present record is a sufficient basis for appellate review because it contains all evidence in aggravation and mitigation of the crime which the parties placed before the jury and because defend-

ant failed to show any specific error or prejudice resulting from failure to report the side bar conferences.

■■■■ The State's position is more convincing. In *White, supra*, this Court required as a prerequisite to appellate review a complete transcript of both the guilt and penalty phases of a defendant's trial so that the sentencing body would not be precluded from considering any mitigating factor offered by defendant. 395 A.2d at 1095. Constitutional mandates are satisfied when an appellate court has a record sufficient to avoid the substantial risk that a death penalty would be imposed arbitrarily or capriciously. *Stephens,* 631 F.2d at 403–4. In the case at bar, all evidence in aggravation and mitigation of defendant's crime was presented to the jury and recorded. Hence, the record is adequate for purposes of appellate review under *White.*

The issue of whether a complete transcript must include a record of all side bar conferences was not addressed in *White.* At the time of the trial of this case the failure of the Trial Court to order all side bar conferences reported would not constitute reversible error unless a defendant could demonstrate specific error or prejudice. *State v. Bolling,* W.Va.Supr.Ct.App., 162 W.Va. 103, 246 S.E.2d 631 (1978). Defense counsel has primary responsibility for seeing to it that a complete record, including side bar conferences, is made for appellate review. *Fountain v. State,* Ark. Supr., 601 S.W.2d 862, 863 (1980).

The defendant here has shown no prejudice other than a bare claim that some prejudice might have resulted. Defendant has neither shown that the unreported side bar conferences contained matters which the jury should have considered nor suggested what matters of substance transpired at these conferences. And defendant did not request during the trial that the side bar conferences be recorded. Consequently, there is no prejudice upon which to base a reversal. The transcript as presented to this Court is a fair and complete record and sufficient for meaningful non-

prejudicial appellate review. This is not to say, however, that in a given case, i.e., where the defendant could point to specific prejudice arising from an unrecorded substantive side bar conference a different result would not follow, and might not follow at this time, since the recording of all substantive side bar conferences is now required.

## IX

Defendant's next contention originally was that "[t]he statutory aggravating circumstance provided under 11 *Del.C.* § 4209(e)(1)(n) is unconstitutionally vague and this does not provide the constitutionally required adequate guideline in channeling the discretion of the sentencing authority in imposing the death penalty." This was obviously based upon the United States Supreme Court's position in *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) that the sentencing authority could not be permitted "unbridled discretion" in determining whether a life should be taken or spared. During the pendency of this appeal, however, the Superior Court concluded, and this Court agreed, that the statutory aggravating circumstance complained of here, i.e., "The murder was outrageously or wantonly vile, horrible or inhuman", was unconstitutionally vague. *State v. Chaplin,* Del.Super., 433 A.2d 327 (1981), *aff'd* Del. Supr., 433 A.2d 325 (1981). As a result, the issue here became whether defendant's death penalty must be vacated because the jury was permitted to weigh the invalid circumstance even though the evidence constituting the circumstance was properly before the jury. This Court declined to address that question without the benefit of the parties' additional briefing on the United States Supreme Court decision in *Zant v. Stephens,* 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983) and *Barclay v. Florida,* 463 U.S. 939, 103 S.Ct. 3418, 77 L.Ed.2d 1134 (1983), which decisions we knew were pending at the time of initial briefing in this matter and involved similar questions.

Now having the benefit of *Zant* and *Barclay* to guide us, we conclude that defendant's death sentence need not be vacated because one of several aggravating circumstances has subsequently been held to be invalid. Before we address the particular argument the defendant advances, however, we find it necessary to review *Zant* and *Barclay* to place them in their proper perspective.

In *Zant,* the United States Supreme Court began by noting that the issue of whether the defendant's death penalty must be vacated, based upon the fact that one of three statutory aggravating circumstances was subsequently deemed invalid, depended "on the function of the jury's finding of an aggravating circumstance under Georgia's capital sentencing statute, and on the reasons that the aggravating circumstance at issue in this particular case was found to be invalid." 103 S.Ct. at 2736. In order to complete this inquiry, the Court began by relying on an exposition of the state law premises on which the Georgia Supreme Court "had consistently stated that the failure of one aggravating circumstance does not invalidate a death sentence that is otherwise validly supported" *Id.* at 2739. The upshot of this explanation by the Georgia Supreme Court was as follows:

The purpose of the statutory aggravating circumstances is to limit to a large degree, but not completely, the factfinder's discretion. Unless at least one of the ten statutory aggravating circumstances exists, the death penalty may not be imposed in any event. If there exists at least one statutory aggravating circumstance, the death penalty may be imposed but the factfinder has a discretion to decline to do so without giving any reason. In making the decision as to the penalty, the factfinder takes into consideration all circumstances before it from both the guilt-innocence and the sentence phases of the trial. These circumstances relate both to the offense and the defendant.

A case may not pass the second plane into that area in which the death penalty is authorized unless at least one statutory aggravating circumstance is found. However, this plane is passed regardless of the number of statutory aggravating circumstances found, so long as there is at least one. Once beyond this plane, the case enters the area of the factfinder's discretion, in which all the facts and circumstances of the case determine, in terms of our metaphor, whether or not the case passes the third plane and into the area in which the death penalty is imposed. *Id.* at 2740 *quoting* 297 S.E.2d 3–4 (citations omitted).

Further reliance was placed on the Georgia Supreme Court's view that:

The evidence of respondent's prior convictions had been properly received and could properly have been considered by the jury ... [1] the mere fact that such evidence was improperly designated "statutory" had an "inconsequential impact" on the jury's death penalty decision ... [and] a different result might be reached if the failed circumstance had been supported by evidence not otherwise admissible or if there was reason to believe that, because of the failure, the sentence was imposed under the influence of an arbitrary factor.

*Id.* at 2740–41 (citation omitted).

From this, the United States Supreme Court framed three federal constitutional issues which were as follows:

First, does the limited purpose served by the finding of a statutory aggravating circumstance in Georgia allow the jury a measure of discretion that is forbidden by *Furman v. Georgia,* 408 U.S. 238 [92 S.Ct. 2726, 33 L.Ed.2d 346] (1972), and subsequent cases? Second, has the rule of *Stromberg v. California,* 283 U.S. 359 [51 S.Ct. 532, 75 L.Ed. 1117] (1931), been violated? Third, in this case, even though respondent's prior criminal record was properly admitted, does the possibility that the reference to the invalid statutory aggravating circumstance in

the judge's instruction affected the jury's deliberations require that the death sentence be set aside? *Id.* at 2741.

The Court then answered all three questions in the negative.

As to the first issue, the Court held that:

Our cases indicate ... that statutory aggravating circumstances play a constitutionally necessary function at the stage of legislative definition: they circumscribe the class of persons eligible for the death penalty. But the Constitution does not require the jury to ignore other possible aggravating factors in the process of selecting, from among that class, those defendants who will actually be sentenced to death. What is important at the selection stage is an *individualized* determination on the basis of the character of the individual and the circumstances of the crime.

*Id.* at 2743–44 (citations omitted) (emphasis supplied).

It went on to conclude that:

Thus the absence of legislative or court-imposed standards to govern the jury in weighing the significance of either or both of those aggravating circumstances does not render the Georgia capital sentencing statute invalid as applied in this case.

*Id.* at 2744.

As to the *Stromberg* case, the first rule of which "requires that a general verdict must be set aside if the jury was instructed that it could rely on any of two or more independent grounds, and one of which is insufficient, because the verdict may have rested exclusively on the insufficient ground", *id.* at 2745, the Court saw no problem, in that "[t]he jury expressly found aggravating circumstances that were valid and legally sufficient to support the death penalty". *Id.* Even as to the second rule of *Stromberg*, which "encompasses a situation in which the general verdict on a single-count indictment or information rested on *both* a constitutional and unconstitutional ground", *id.* (empha-

sis supplied), the Court again saw no problem and went on to state that:

in this case there is no suggestion that any of the aggravating circumstances involved any conduct protected by the First Amendment or by any other provision of the Constitution. Accordingly, even if the *Stromberg* rules may sometimes apply in the sentencing context, a death sentence supported by at least one valid aggravating circumstance need not be set aside under the second *Stromberg* rule simply because another aggravating circumstance is "invalid" in the sense that it is insufficient by itself to support the death penalty. In this case, the jury's finding that respondent was a person who has a "substantial history of serious assaultive criminal convictions" did not provide a sufficient basis for imposing the death sentence. But it raised none of the concerns underlying the holdings in *Stromberg*, for it did not treat constitutionally protected conduct as an aggravating circumstance.

*Id.* at 2746.

On the final issue, to which the defendant argued that reference to an invalid statutory aggravating circumstance "may have affected the jury's deliberations and the Court of Appeals on rehearing commented that it may have unduly directed the jury's attention to his prior conviction", the Court noted two things. First, "any evidence ... that respondent had previously been convicted ... was properly adduced at the sentencing hearing and was fully subject to explanation by the defendant", *id.* at 2748, and, second,

[t]he effect the erroneous instruction may have had on the jury is therefore merely a consequence of the statutory label "aggravating circumstance." That label arguably might have caused the jury to give somewhat greater weight to respondent's prior criminal record than it otherwise would have given. But we do not think the Georgia Supreme Court erred in its conclusion that the "mere fact that some of the aggravating cir-

cumstances presented were improperly designated 'statutory' " had "an inconsequential impact on the jury's decision regarding the death penalty."

*Id.* at 2749.

Tying all three issues together, the Court noted that:

Our decision in this case depends in part on the existence of an important procedural safeguard, the mandatory appellate review of each death sentence by the Georgia Supreme Court to avoid arbitrariness and to assure proportionality. We accept that court's view that the subsequent invalidation of one of several statutory aggravating circumstances does not automatically require reversal of the death penalty, having been assured that a death sentence will be set aside if the invalidation of an aggravating circumstance makes the penalty arbitrary or capricious. *Id.* at 2749–50.

And, finally that:

in deciding this case we do not express any opinion concerning the possible significance of a holding that a particular aggravating circumstance is "invalid" under a statutory scheme in which the judge or jury is specifically instructed to weigh statutory aggravating and mitigating circumstances in exercising its discretion whether to impose the death penalty.

*Id.* at 2750.

In *Barclay, supra,* the Supreme Court was required to determine whether reversal of the defendant's death sentence was required when one of the aggravating circumstances relied upon was not established by the Florida death penalty statute under which the sentencing authority was required to weigh statutory aggravating and statutory mitigating circumstances. Here again, like in *Zant,* the Court began by noting how a death penalty is imposed under the Florida statute, noting, however, that "unlike the Georgia statute, ... Florida law requires the sentencer to *balance* statutory aggravating circumstances against all mitigating circumstances and

does not permit non-statutory aggravating circumstances to enter into this weighing process". 103 S.Ct. at 3426. It is noteworthy, however, that this balancing occurs at the threshold determination of whether the death penalty may even be considered rather than at a later discretionary stage.

Having considered the Florida statute, the Court recognized that "[i]f the Trial Court properly found that there are no mitigating circumstances, the Florida Supreme Court applies a harmless error analysis", *id.* at 3426–27 (citations omitted), under which "a reversal of the death sentence would not necessarily be required ... because the error might be harmless". *Id.* at 3427 *quoting Ferguson v. State,* Fla.Supr., 417 So.2d 639, 646 (1982). So viewed, the Court then framed the basic issue before it as "whether the Trial Judge's consideration of this improper aggravating circumstance so infects the balancing process created by the Florida statute that it is constitutionally impermissible ... [to] let the sentence stand". *Id.* 103 S.Ct. at 3427–28. Relying on *Proffitt, supra,* for the proposition that there is "no constitutional defect in a sentence based on both statutory and nonstatutory aggravating circumstances", *id.* at 3428, the Court answered this in the negative stating that "[t]here is no reason why the Florida Supreme Court cannot examine the balance struck by the Trial Judge and decide that the elimination of improperly considered aggravating circumstances could not possibly affect the balance". *Id.*

Having set out in some detail the analysis present in *Zant* and *Barclay,* we now turn our attention to the defendant's argument which we perceive as being two pronged. First, defendant argues that "[t]he Delaware capital sentencing scheme requires the sentencing authority to weigh aggravating and mitigating circumstances as a threshold requirement for imposition of a death penalty," somewhat akin to the Florida procedure. Second, under that interpretation of our statute, "[t]he [defendant's] death [sentence] must be set aside as

a matter of law, in that it cannot be determined that the jury's finding ... of ... one improper statutory aggravating circumstance did not affect the weighing process ..." based on the assertion that "the jury ... made no specific findings with respect to the existence of any mitigating circumstances, nor was it required to do so under § 4209 or *State v. White, supra."* Since we find that defendant's interpretation of our statute as requiring a balancing process as a threshold requirement is misguided, we hold that defendant's entire argument fails and, as defendant concedes, "where consideration of the sentencing authority of aggravating and mitigating circumstances is a post-threshold discretionary process, ... application of a 'harmless error' analysis [like that in *Zant*] is sufficient to determine if the finding ... of an improper aggravating circumstance requires vacation of a death sentence".

As mentioned in our prior analysis, the Supreme Court in *Zant* and *Barclay* indicated that the question of whether a death sentence must be vacated, if imposed in part upon an improper aggravating circumstance, depends upon the function of the finding of an aggravating circumstance under the applicable capital-punishment scheme. Such an examination of our statute illustrates the substantial similarity of Delaware's statute to Georgia's death penalty scheme. As we have noted in the past, "[t]he Delaware statute was obviously fashioned upon the Georgia statute approved by the United States Supreme Court in *Gregg*". *White, supra* at 1085. More particularly, like Georgia, Delaware has a pyramidal system whereby the sentencing authority must "pass through three phanes of division between the base and the apex," *Zant* 103 S.Ct. at 2739 *quoting* 297 S.E.2d at 3–4, before imposing the death sentence.

■ The three stages of jury decision-making in Delaware and Georgia serve the same function. At the first stage, the jury determines whether the defendant has committed one of the narrow category of crimes that can receive death as a punishment. After that guilt determination, the jury makes the threshold determination, which serves both to limit the jury's discretion and narrow "the category of persons convicted of murder who are eligible for the death penalty", by determining whether at least one of the statutorily enumerated aggravating circumstances exist. *Id.* at 2741. Then, if the threshold is crossed, "the case enters the area of the factfinder's discretion, in which all the facts and circumstances of the case determine ... whether or not the case passes the third plane and into the area in which the death penalty is imposed". *Id.* at 2740 *quoting* 297 S.E.2d at 4.

Thus, we find that under our statute the "consideration" or "weighing" of all the facts in aggravation and mitigation takes place only at this last discretionary phase and not at the threshold stage. So viewed, we find that we only need address whether consideration of the invalid statutory circumstance was harmless error in line with the rationale present in *Zant.* In reaching this result, we also find that it is clear that Delaware does not have a "weighing" statute as contemplated by the Court in *Zant* and upon which the Court reserved decision. *See id* at 2750. We reach this conclusion because the Court in *Zant* distinguished the Georgia statute, which we obviously find more similar to our statute than the Florida scheme in *Barclay,* from the "weighing statutes" on the basis that "the jury is not instructed to give any *special weight* to any aggravating circumstance, to consider multiple aggravating circumstances ... *more significant* than a single such circumstance, or to balance aggravating against mitigating circumstances *pursuant to any special standard" Id.* at 2741 (emphasis added). Thus, under *Zant,* it necessarily follows that Delaware is not a "weighing" state. While the jury in Delaware is told to weigh and consider certain circumstances, the fact that they are not told how to weigh them and that this "weighing" occurs at the discretionary

stage, renders defendant's argument meaningless.

Taking into consideration the jury's determination that the murders were "outrageously or wantonly vile, horrible or inhuman", we find that such a determination is based upon the jury's view of the crime itself which is constitutionally required. The "consideration of the circumstances of the particular offense [is] a constitutionally indispensible part of the process of inflicting the penalty of death". *Woodson v. North Carolina*, 428 U.S. 280, 304, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976). *Accord, California v. Ramos*, 463 U.S. 992, ——, 103 S.Ct. 3446, 3450, 77 L.Ed.2d 1171, 1184 (1983) (jury must consider individual characteristics of defendant and offense, including nature and circumstances of crime). *See also Zant, supra; Barclay, supra.* Likewise our death penalty statute requires consideration of "all relevant evidence ... which bears upon the particular circumstances or details of the offense ..." 11 *Del.C.* § 4209(d)(1)(b). Based on this concept, we necessarily conclude that the evidence considered by the jury in making its determination was not constitutionally objectionable. Therefore, we deem any error in considering the invalid statutory circumstance as harmless. Further, as to any claim that the alleged duplication in statutory aggravating circumstances caused the jury to affix too much weight to them, our review of the trial transcript reveals no effort by the Trial Court to instruct the jury to "place particular emphasis on the role of statutory aggravating circumstances in [its] ultimate decision". *Zant* 103 S.Ct. at 2749. And nowhere did the Trial Court suggest "that the presence of more than one aggravating circumstance should be given special weight." *Id* at 2750.

As the Supreme Court stated in the affirmance of the defendant's death sentence in *Zant*, we likewise find that:

Our decision in this case depends in part on the existence of an important procedural safeguard, the mandatory appellate review of each death sentence ... to avoid arbitrariness and to assure proportionality. *Id.*

The fact that our mandatory review results in the affirmance of defendant's death penalty here does not render this review any less meaningful.

X

Defendant's final contentions, which are essentially related, are as follows:

(a) The imposition of the death penalty upon a defendant convicted of murder in the first degree for an unintentional killing is an excessive punishment constituting cruel and unusual punishment in violation of the eighth and fourteenth amendments.

(b) The imposition of a penalty of death upon this defendant violates both the prohibition against cruel and unusual punishment and the mandates of 11 *Del.C.* § 4209(g)(2)(a) because this penalty is disproportionate and there is an insufficient number of cases arising under this statute to permit a finding that the sentence is proportionate.

We find no merit to either contention.

In regard to the claim that the death penalty is inherently disproportionate for felony murder, the defendant begins by asserting that:

In sustaining the imposition of the death penalty in *Gregg* [*supra*], however, the Court firmly embraced the holdings and dicta from prior cases. *Furman v. Georgia, supra; Robinson v. California*, 370 US 660, 8 L Ed 2d 758, 82 S Ct 1417 (1962); *Trop v. Dulles*, 356 US 86, 2 L Ed 2d 630, 78 S Ct 590 (1958); and *Weems v. United States*, 217 US 349, 54 L Ed 793, 30 S Ct 544 (1910), to the effect that the Eighth Amendment bars not only those punishments that are "barbaric" but also those that are "excessive" in relation to the crime committed. Under *Gregg*, a punishment is "excessive" and unconstitutional if it (1) makes no measurable contribution to acceptable goals of punishment and hence

is nothing more than the purposeless and needless imposition of pain and suffering; or (2) is grossly out of proportion to the severity of the crime. A punishment might fail the test on either ground.
*Coker v. Georgia,* 433 U.S. 584, 591–92 [97 S.Ct. 2861, 2865–66, 53 L.Ed.2d 982] (1977); *See also, Lockett v. Ohio,* 438 U.S. 586, 625 [98 S.Ct. 2954, 2983, 57 L.Ed.2d 973] (1978) (White, J., concurring); *Accord, Solem v. Helms,* 463 U.S. 277 [103 S.Ct. 3001], 77 L.Ed.2d 637 (1983).

In harmony therewith, defendant points out that the Court in *Coker* has found the death penalty "excessive" for the crime of rape of an adult woman.

Those cases relied upon by defendant, however, are not the only guidance available to us at this time. Since the initial briefing on this appeal, the United States Supreme Court has ruled in *Enmund v. Florida,* 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), that the death penalty is also excessive when inflicted upon a getaway driver, since he did not kill, intend to kill or contemplate that a killing might take place. *Id.* at 801, 102 S.Ct. at 3379.

Placing these cases in their proper perspective and even assuming that *Enmund* stands for the proposition that a special intent to kill is required to inflict the death penalty, contrary to the great weight of authority, *Skillern v. Estelle,* 5th Cir., 720 F.2d 839 (1983); *Hutchins v. Garrison,* 4th Cir., 724 F.2d 1425, 1435, fn. 14 (1983); *Henry v. Wainwright,* 5th Cir., 721 F.2d 990 (1983), defendant's contention is rendered meaningless here in that the defendant was not only convicted and sentenced for felony murder, but also for intentional murder of each victim under 11 *Del.C.* § 636(a)(1). Thus, we find that *Enmund* is inapposite to the present situation in that the killing here, unlike in *Enmund,* was intentional, or at the very least, the reck-

less conduct upon which defendant's conviction rests was within the ambit of contemplation that a killing might result. 11 *Del.C.* § 253; see Part V, *supra.* So viewed, defendant's sentence was proper. Consequently, we see no need to address whether Delaware's felony murder rule is sufficiently distinguishable from Florida's statute in *Enmund* to be constitutionally sound based on the premise that 11 *Del.C.* § 636(2) and (6) require proof that the killing was done recklessly or with criminal negligence whereas Florida requires no proof of an additional mental element.[8]

Having concluded that the death penalty is not inherently disproportionate, i.e., excessive, as to felony murder, we now turn our attention to whether the death penalties defendant received are comparatively disproportionate. At the outset, we pay particular attention to the United States Supreme Court decision in *Pulley v. Harris,* 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984), which rejected the conclusion of the Ninth Circuit in *Harris v. Pulley,* 9th Cir., 692 F.2d 1189 (1982) that appellate review of every death sentence for comparative excessiveness is constitutionally mandated under the Eighth and Fourteenth Amendments.

In *Pulley,* the Court indicated that "[e]xamination of our 1976 cases [*Gregg, Proffitt,* and *Jurek, supra*] makes clear that they do not establish proportionality review as a constitutional requirement." 465 U.S. at ——, 104 S.Ct. at 879, 79 L.Ed.2d at 37. The Court noted that, while the two principal opinions in *Gregg,* upholding the "much-copied" Georgia death penalty statutes, "made much of the statutorily-required comparative proportionality review", such review "was considered an additional safeguard against arbitrary or capricious sentencing". 465 U.S. at ——, 104

---

**8.** For purposes of this issue, we note that at the time such analysis is undertaken under 11 *Del.C.* § 636(a)(6) and 11 *Del.C.* § 4209(e)(1)(j), the death penalty in Delaware may only be imposed for felony murder "committed while the defendant was engaged in the commission of, or attempt to commit, or flight after committing or attempting to commit any degree of rape, arson, kidnapping, robbery, sodomy or burglary." *See* § 4209(e)(1)(j).

S.Ct. at 879, 79 L.Ed.2d at 37. Thus, the Court pointed out that:

> (a)ny capital sentencing scheme may occasionally produce aberrant outcomes. Such inconsistencies are a far cry from the major systemic defects identified in *Furman.* As we have acknowledged in the past, "there can be 'no perfect procedure for deciding in which cases governmental authority should be used to impose death.'" *Zant v. Stephens,* 462 U.S. [862] at ——, 77 L.Ed.2d at 235, 103 S.Ct. 2733 [at 2747], quoting *Lockett v. Ohio,* 438 U.S. 586, 57 L.Ed.2d 973, 98 S.Ct. 2954 (1977) (plurality opinion). As we are presently informed, we cannot say that the California procedures provided Harris inadequate protection against the evil identified in *Furman.* 465 U.S. at ——, 104 S.Ct. at 881, 79 L.Ed.2d at 42.

Based upon the *Pulley* analysis, we see that there is no constitutional requirement that a state's death penalty statute provide for proportionality review. Regardless of the decision in *Pulley,* however, such review, although not constitutionally required, is mandated in Delaware under the provision of 11 *Del.C.* § 4209(g)(2)(a). Therefore, irrespective of the conclusion reached by the Court in *Pulley,* we deem it necessary to undertake such a comparison. *Accord State v. White,* Del.Supr., 395 A.2d 1082 (1978). (Where this Court held that the Delaware legislature is enacting § 4209(g) "has adopted the nature and scope of appellate review of each death sentence" provided under the Georgia statute approved in *Gregg* ).

 The chief problem in proportionality review, and the one complained of by defendant, is selecting an array of similar cases with which to compare the death penalty imposed below. See Baldus, Pulaski, Woodworth & Kyle, *Identifying Comparatively Excessive Sentences of Death: A Quantitative Approach,* 33 Stan.L.Rev. 1, 4n. 13 (1980) (Baldus). The United States Supreme Court has not spoken unanimously on the issue of which cases are to be placed in the universe of similar cases for purposes of appellate review (when such a review is undertaken). See *id.* at 5 n. 13. It is apparently settled, however, that a court conducting a proportionality review need not consider cases involving defendants charged with First Degree Murder, but ultimately convicted of lesser offenses. See *Id.,* citing *Gregg v. Georgia,* 428 U.S. 153, 199 & 225–26, 96 S.Ct. 2909, 2937, 2949, 49 L.Ed.2d 859, 889, 903 (1976). The Justices of the United States Supreme Court have split, however, on the question of whether appellate courts should limit their proportionality review only to First Degree Murder cases in which appeals were taken. See *Id.* at 5, n. 13. The Georgia Supreme Court routinely considers appealed First Degree Murder cases in which both life imprisonment and death sentences were imposed, but does not normally consider non-appealed cases or cases involving homicides where convictions are not obtained. See *Id.* A three Justice plurality in *Gregg* agrees, however, that failure to consider non-appealed cases does not render the proportionality review "ineffective." *Id., quoting Gregg v. Georgia,* 428 U.S. 153, 204 n. 56, 96 S.Ct. 2909, 2940 n. 56, 49 L.Ed.2d 859, 892 n. 56, (1976). Based on the implications that can be drawn from these developments, however, we conclude that the principle touchstone to bear in mind when selecting the "universe" of cases is that found in *Ross v. State,* Ga.Supr., 233 Ga. 361, 211 S.E.2d 356, 359 (1974), where the Georgia Supreme Court expressed the view that "reference to appeal cases which represent a sufficient cross section of similar cases" is an adequate standard against disproportionate sentencing. We recognize that the task of culling a universe of similar cases from the ranks of First Degree Murder cases is a monumental one, especially in states having a large number of convictions for First Degree Murder. "[H]ow one classifies other cases in terms of the particulars of the offense and the characteristics of the offender so that one can compare the death sentence under scrutiny with sen-

tences imposed in 'similar' cases is critical to the entire inquiry". Baldus, *supra*, at 4. But, as a basis for proportionality review in Delaware as required under 11 *Del.C.* § 4209(g)(2)(a), we think it inherently fair, logical and necessary to prevent disproportionate sentencing that this Court compare the sentence below to the facts and circumstances of cases in which a capital sentencing proceeding was actually conducted, whether the murders have been sentenced to life imprisonment or death.[9] *Accord, Tichnell v. State*, Md.Ct.App., 297 Md. 432, 468 A.2d 1 (1983). (Holding that "the legislatively intended inventory of cases from which 'similar cases' are to be culled encompasses only those first degree murder cases in which the State sought the death penalty under § 413, whether it was imposed or not"). *But see, Spinkellink v. Wainwright*, 5th Cir., 578 F.2d 582, 599 n. 24 (1978), *cert. denied*, 440 U.S. 976, 99 S.Ct. 1548, 59 L.Ed.2d 796 (1979). Moreover, it makes no difference whether the universe of those similar cases includes appealed or non-appealed life imprisonment or death sentences for First Degree Murder, so long as the universe of cases "represents a sufficient cross section of similar cases." *Ross*, 211 S.E.2d at 359. Whether a case is "similar" and, therefore, to be placed in the universe of such cases shall depend upon the particulars of the offense and the characteristics of the defendant. *See State v. Copeland*, S.C.Supr., 278 S.C. 572, 300 S.E.2d 63. And we limit the universe of cases to cases decided under our current Statute. To include cases decided before enactment of the present Statute would require consideration of cases decided under the various constitutionally infirm statutes which predate the current one.

Having established the standard to apply whenever a comparative proportionality review is undertaken pursuant to 11 *Del.C.* § 4209, we now turn our attention to applying that standard to the instant appeal.

At the outset, we note that there are *149* cases presently on file with this Court, those files representing compliance with our directive in *State v. White*, 395 A.2d 1082 (1978), that the Trial Judge file a report "of each case in which there was an indictment for murder in the first degree and (a) a guilty plea to a lesser included offense was taken; (b) the charge was reduced for the purpose of trial; or (c) the death penalty was not imposed after trial ..." *Id.* at 1095 (footnote). We find that these cases constitute the entire "pool" of cases from which we draw the "universe" of similar cases to consider in a comparative proportionality review.

Turning to the *149* cases, we see that in *16* situations the case was either dismissed or nolle prossed (the latter situation arising twice due to the death of the defendant).[10] In *6* of the *149* cases, the defendants have not yet been brought to trial as to the guilt phase although four are already scheduled (another is pending following the Trial Judge *sua sponte* granting a mistrial during jury selection because of possible references to the case contained within newspapers found in the jury anteroom; the other is awaiting the results of defendant's psychological testing).[11] In *4* other cases, a new information was filed after initial indictment in which the charges were reduced.[12] In *71* cases defendant pled guilty to a lesser charge (one occurring after the charge of Murder in the First Degree was nolle prossed after defendant agreed to testify against a co-defendant; another

---

**9.** While it might appear that the universe of cases to be considered has been deemed broader by this Court in *State v. White*, Del.Supr., 395 A.2d 1082 (1978), to draw such a conclusion is unfounded. In *White*, we merely indicated the pool from which the universe of similar cases was to be drawn, such pool being necessarily broader than the "universe" adopted today.

**10.** See List I at Appendix D *infra*

**11.** See List II at Appendix E *infra*

**12.** See List III at Appendix F *infra*

arising when the defendant had been originally tried on Murder in the First Degree, convicted, sentenced to life, but remanded by this Court, and two others arising when defendant entered a *Robinson*-type plea);[13] In still other cases, no penalty hearing was held because (a) the defendant was found guilty of only a lesser included offense (*11* cases); (b) defendant had pled guilty to Murder in the First Degree (*6* cases; one occurring after. defendant had been originally tried for Murder in the First Degree, convicted, sentenced to life, and the matter reversed on appeal; another occurring although defendant later moved to withdraw his plea, which motion was denied); (c) the State did not seek the death penalty although defendant was convicted as charged (*7* cases, one because of the United States Supreme Court's decision in *Enmund, supra,* and another because the only statutory aggravating circumstance on which the State could seek an instruction had previously been deemed unconstitutional); and (d) in *5* cases, defendant was found not guilty as charged (in two cases by reason of mental illness).[14] Due to the listed disposition of these cases, all *125* cases of those mentioned (out of *149* total) do not fall within the universe of cases to consider which is set forth *supra.* Therefore, we now turn our attention to those *24* cases which remain and in which a penalty hearing as provided in § 4209 was held.

In *4* of the *24* remaining cases, the jury at the penalty hearing imposed a life sentence because no statutory aggravating circumstance was found.[15] Since the sentencing jury in our present case found aggravating circumstances to exist, we find this distinction to be a sufficient basis on which to conclude that we need not consider more specifically the facts and circumstances of these *4* cases. So concluding, we are left with *22* cases, fourteen in which defendant

was sentenced to life imprisonment although a statutory aggravating circumstance had been found, and the six cases in Delaware in which the death penalty was imposed, obviously involving an initial finding of a statutory aggravating circumstance.[16] Together, these twenty-two cases comprise what we find to be the "universe" of "similar" cases adequate for comparative proportionality review. Thus, we briefly set forth the facts of each case in an effort to provide a sufficient foundation on which to base our comparison. In those cases where more than one defendant was charged with Murder in the First Degree arising out of the same activity, it is so noted.

CHARLES BLIZZARD and RONNIE E. CORDELL—Defendants, accompanied by their minor girlfriends, entered a fenced-in storage area of a private company. The 55 year old victim who happened by was grabbed by defendants, beaten and kicked into unconsciousness, relieved of approximately $10 in cash, and left lying on the ground. The wounds received by the victim resulted in his death by asphyxia. Defendants, tried together, both received jury recommendations of life sentences although the jury unanimously found the statutory aggravating circumstances that the murder was committed while defendants were engaged in the commission of a robbery.

JUDITH McBRIDE and FRANK L. ROSS [17]—Defendants, along with Robert D. Kreider who pled to conspiracy in the Second Degree, planned and carried out the murder of Judith McBride's estranged husband. The plan required that Judith take her husband a prepared meal which had been laced with valium. Further, Judith was to have sexual intercourse with the victim in the thought of removing her from

---

**13.** See List IV at Appendix G *infra*

**14.** See List V at Appendix H *infra*

**15.** See List VI at Appendix I *infra*

**16.** See List VII at Appendix J *infra*

**17.** See *McBride v. State,* Del.Supr., 477 A.2d 174 (1984). See *Jensen v. State,* Del.Supr., 482 A.2d 105 (1984). See *Ross v. State,* Del.Supr., 482 A.2d 727 (1984).

being a potential suspect in the case. Then, after victim was unconscious due to the drug, Ross was to strike victim on the head and place him in the bathtub to make it appear that death was accidental. The plan worked as anticipated except that victim awoke when he was struck on the head by Ross. Ross then stabbed the victim to death. Both defendants received life sentence recommendations although the jury unanimously found in Judith's case the statutory aggravating circumstance that defendant caused or directed another to commit murder, and in Ross's case the statutory aggravating circumstances that defendant committed the murder for pecuniary gain (a 50/50 split with Judith of victim's $20,000 life insurance policy), and that defendant committed the murder as an agent or employee of another person.

RICHARD MASSEY and ROBERT J. MARTIN [18]—During the late morning, early afternoon hours, defendants entered the home of the 60 year old female victim via a rear door. The victim was later found with a bullet wound in the back of the head, fired from close range. The dwelling had been ransacked, and antique guns, old coins, jewelry, and other valuables were missing. Defendants were tried together as to the guilt phase, but separate penalty hearings were held for each before the Trial Jury. Massey's penalty hearing was held first. The jury recommended life imprisonment instead of the death penalty sought by the State. Thereafter, the State did not seek the death penalty for Martin at his penalty hearing. Both defendants received life sentences.

BALLARD BOATSON [19]—Defendant struck the 56 year old male victim in the head with a 2½ foot piece of pipe while victim lay asleep in his own home. Defendant then threatened another occupant of the house before he existed and was found by police in front of the house yelling that he had hit the victim and he hoped that the victim would die. Defendant later told police that the victim had earlier made derogatory remarks about defendant's mother. Defendant received a life sentence recommendation although the sentencing jury found as a statutory aggravating circumstance that defendant had previously been convicted of another felony involving the use of, or threat of, force or violence upon another person.

JAMES L. BLOUNT, JR.—During mid-afternoon, the victim, a 68 year old minister, left his home, drove to a nearby park, and left his car to walk in the park. Defendant approached the victim, shot him twice in the chest with a .38 calibre revolver, and removed the victim's watch and wallet. Defendant then ran from the scene. Two statutory aggravating circumstances were found by the sentencing jury, i.e., the murder was committed while defendant was engaged in the commission of a robbery and that the victim was 62 years of age or older, but defendant received only a life sentence recommendation.

TYRONE BROOKINS and JAPHIS LAMPKINS [20]—Defendants, along with Thomas M. Butler, III who pled guilty to his only charge of Conspiracy in the Second Degree, followed the victim, a 59 year old woman, from a supermarket to her apartment 4 blocks away and gained entrance into the apartment by either barging in behind victim or knocking shortly after the victim had entered. After entry, defendants Brookins and Lampkins stabbed the victim 23 times, struck her in the head with two different blunt objects, and finally, one of the defendants strangled the victim. Defendants, who were tried together, both received life sentence recommendations although the jury as to each defendant found as a statutory aggravating circumstance that the murder was committed while de-

**18.** *Martin v. State,* Del.Supr., 433 A.2d 1025 (1981).

**19.** *See Boatson v. State,* Del.Supr., 457 A.2d 738 (1983).

**20.** See *Lampkins v. State,* Del.Supr., 465 A.2d 785 (1983).

fendant was engaged in the commission of burglary.

JAMES W. WALLER [21]—Defendant, along with co-defendants Eleanor Waller and Bobby A. Anderson who pled guilty to reduced charges and a George W. Gray who was found guilty of Murder in the First Degree but did not have a § 4209 penalty hearing because the State did not seek death apparently because James Waller had received only life imprisonment at a similar hearing, tied a 67 year old male victim to a tree, gagged the victim, and removed $149.00 from the victim's person. Victim, found tied to the tree, was later pronounced dead at the scene. Defendant Waller was recommended a life sentence although the sentencing jury found as an aggravating circumstance that the murder was committed during the commission of a robbery and/or kidnap.

DAVID WAYNE DODSON—Defendant, along with co-defendant, Percy Ewell Wainwright, for whom the State did not seek the death penalty due to the United States Supreme Court's decision in *Enmund, supra*, attempted a robbery of a liquor store. While one of the defendants waited in the get-away vehicle outside the store, the other entered the store with a sawed-off .12 gauge shotgun and shot the victim, who was standing behind the sale counter, one time in the chest area. No money or property was taken during the attempt. The sentencing jury, which was the same jury that had convicted defendant, found by special interrogatory that, beyond a reasonable doubt, defendant, either shot the victim, or intended that a killing take place during the robbery, or contemplated that lethal force would be employed during the commission of a robbery. They further found the three statutory aggravating circumstances: (a) defendant was previously convicted of murder, (b) the murder was committed by a person who had escaped from a place of confinement, and (c) the murder was committed while defendant

was engaged in the attempted commission of robbery. The jury recommended a life sentence notwithstanding the other findings.

FRANK C. WHALEN [22]—Defendant forceably entered the home of the 90 year old female victim at night and raped and strangled her to death in the same bed in which the victim's partially deaf and blind husband was sleeping. At the time, the victim weighed approximately 100 pounds, and measured 5 feet in height. Defendant, who knew the victim and her husband, had the death penalty recommended by the same jury that had convicted him and which had found as a statutory aggravating circumstance that the murder was committed while defendant was engaged in the commission of rape.

BILLIE BAILEY—Defendant, who had escaped from custody, asked his brother-in-law to take him to a liquor store to make a purchase. Unbeknownst to his brother-in-law, the defendant had a loaded pistol and committed a robbery in the store. He then had his brother-in-law drive him a short distance from the store and exited the vehicle in the vicinity of the home of his later victims. Shortly thereafter, defendant entered the victims' home and shot one, a 73 year old female, once in the back of the head and the other, her 80 year old husband, twice with the pistol used during the liquor store robbery. Defendant then took a shotgun owned by the victims, a single shot model which had to be opened and reloaded after each shot, and shot the wife again, once in the back and again the abdomen, and the husband again, once in the face, all shots taken at very close range to the given victim. The same jury which had convicted defendant, recommended the death penalty, having found four aggravating circumstances, (a) the murder was committed by a person who had escaped from the custody of a law-enforcement officer or place of confinement; (b) defendant's con-

---

**21.** See *Gray v. State,* Del.Supr., 441 A.2d 209 (1982).

**22.** See *Whalen v. State,* Del.Supr., 434 A.2d 1346 (1981).

duct resulted in the death of 2 or more persons; (c) the murder was committed while defendant was engaged in the commission of, or attempt to commit, or flight after committing or attempting to commit robbery, and (d) the murder was outrageously or wantonly vile, horrible or inhuman, the latter being deemed unconstitutional at a later date.

JAMES WILLIAM RILEY—Defendant, along with a co-defendant who pled guilty to Accomplice to Murder in the First Degree and another co-defendant who testified against defendant after the State entered a nolle prosequi on two counts of Murder in the First Degree, shot to death a 59 year old male during an armed robbery of a liquor store. Victim was shot twice, once in the left knee and once in the chest. When the police arrived, a quart bottle of beer taken from the cooler was bagged and sitting on the countertop, the cash drawer was found open with no money, and a broken bottle of wine, believed thrown by the victim at the defendant(s) was found inside the exit door. The same jury that had convicted defendant, unanimously recommended the death sentence having found as a statutory aggravating circumstance that the murder was committed while defendant was engaged in the commission of robbery.

DAVID RUSH—Defendant returned to the stereo store where he had been earlier and engaged a sales person and manager in discussion concerning information about a piece of stereo equipment. After spending approximately one hour going over the functions of the piece of equipment, defendant indicated that he wanted to purchase the article and the transaction proceeded to the front counter of the store. After replying that he intended to pay "cash" for the item and was told the total price amounted to "$497.00", defendant pulled out a gun and shot a third store employee and the original sales person. He then fired a shot at the manager as well as a patron of the store, who had entered while defendant's transaction was going on. Defendant then ordered the patron to leave the store but before allowing him to do so, ordered him to start taking more equipment out to his van. While this was going on, defendant ordered the manager to get up off the floor and to open the cash register. When the manager was unable to open the register, defendant walked up behind him and shot him in the back. During the confusion which followed, the patron while outside was able to escape to call for assistance and the manager was able to lock defendant out of the store and also summon help. The manager died as a result of the wounds inflicted. The same jury which had convicted defendant, recommended the death penalty having found as a statutory aggravating circumstance that the murders were committed while defendant was engaged in the commission of robbery and/or kidnapping.

ANDRE DEPUTY—Deputy was the co-defendant of the defendant Flamer who is the subject of this appeal. Deputy was tried almost two years to the day after Flamer. For our purposes, the summary of the offense which appears at the beginning of this opinion adequately sets forth the circumstances of the crime, however, we do note that in Deputy, as in Flamer, the sentencing jury before recommending the death penalty found three statutory aggravating circumstances: (a) defendant's conduct resulted in the death of 2 or more people, (b) the murder was committed while defendant was engaged in the commission of robbery, and (c) the murder was committed for pecuniary gain. (Note—a fourth aggravating circumstance was found in *Flamer*, but as indicated earlier that circumstance was later deemed unconstitutional and here we found that its consideration was harmless error).

Having briefly summarized the *17* other cases to which we compare defendant Flamer's case, we find that Flamer's death sentence is not comparatively disproportionate.

Each of the *18* cases in our universe represents a horrible, senseless killing. To

compare one against the other is a difficult task, almost like trying to compare the proverbial oranges and apples. In each there are different facts, different aggravating and mitigating circumstances, different prosecutors and defense counsel, and, above all, juries of *12* different persons who are cloaked with the discretion of reaching a unanimous verdict of death, or, absent unanimity as to death penalty returning what becomes a life term judgment. We do not conduct post trial inquiries into the basis of a jury's verdict. In fact, we prohibit such an inquiry absent unforeseen circumstances. Neither does our statute require an identification of possible mitigating circumstances considered by the jurors during the process of weighing aggravating and mitigating circumstances. Therefore, definitive comparison of cases is almost impossible and necessarily touches upon the realm of speculation.

On the other hand, we discern a pattern of death sentences in those cases in our "universe" involving multiple unprovoked murders of helpless elderly victims, i.e., *Flamer, Deputy, Bailey,* and the rape-murder of the elderly lady followed by her invalid husband's demise in *Whalen.* We also note the beginning of a pattern of death verdicts in shopkeeper robbery-murders, i.e., *Rush* and *Riley.* But then we have *Dodson,* a totally unexplainable shopkeeper robbery-murder and a life sentence verdict involving an escapee previously sentenced to prison on an unrelated homicide, and *Blount,* the unprovoked robbery-murder of an elderly minister.

In comparing and rationalizing the remaining life sentences with this case, we note with particularity in *Martin* and *Massey* that those defendants apparently were startled by the victim while they were burglarizing the victim's home in search of antique guns and coins collected by victim's husband. There is no evidence they were armed when they entered the home. One of them killed the victim with a loaded pistol found in a night table. Both defendants had felony records, but the jury could not determine who was the trigger man.

Also in the *Blizzard-Cordell* life sentence case the defendants were minor "show-offs" who robbed and beat the 55 year old intoxicated skid row vagrant to satisfy their juvenile ego, and in the *Brookins-Lampkins* case there were three defendants, one of whom pled guilty to a lesser charge for turning State's evidence against co-defendants. This, of course, was known to the jury as it was in the *Waller* case, in which three co-defendants plea bargained for lesser charges in return for their cooperation with the State.

In addition, we have the life sentence killer for hire cases of McBride and Ross. During the respective trials of McBride and Ross, the juries were plagued with the evidence of cruelty, brutality and harassment inflicted upon Mrs. McBride and their handicapped child by the victim, as well as the hired killer Ross's mental and emotional instability. All of this was offered by the defense in each case in mitigation resulting in the life sentences in lieu of death penalty verdicts in spite of the horrible nature of the crime.

Having reviewed the judges' reports and factual background in the *18* cases in our universe of "similar" cases, we are satisfied that the imposition of death in this case was neither arbitrarily nor capriciously imposed, nor is it disproportionate to the penalties imposed in the *17* other cases, all but one of which was brought to trial after this case.[23] The *Flamer* jury found and relied upon three statutory aggravating circumstances, one aggravating circumstance ruled unconstitutional but properly considered, Flamer's previous felony record, and blood relationship to one of the victims, as weighed against the mitigating circumstances presented, of excessive alcohol involvement, unstable lifestyle and influence of co-defendant. Of all *18* cases in our universe of cases there is none in which the

---

**23.** It is noteworthy that Andre Deputy, Flamer's co-defendant, was not brought to trial until almost two years after Flamer, same facts, different jury, same result.

death penalty would appear to be more appropriate since the Delaware General Assembly has opted to make such penalty under certain circumstances subject to jury discretion.

For the foregoing reasons, the convictions and sentences are hereby

\*　　\*　　\*　　\*　　\*　　\*

AFFIRMED.

## APPENDIX A

**§ 4209. Punishment, procedure for determining punishment, review of punishment and method of punishment for first-degree murder.**

(a) *Punishment for first-degree murder.*—Any person who is convicted of first-degree murder shall be punished by death or by imprisonment for the remainder of his or her natural life without benefit of probation or parole or any other reduction, said penalty to be determined in accordance with this section.

(b) *Separate hearing on issue of punishment for first-degree murder.*—(1) Upon a conviction of guilt of a defendant of first-degree murder, the Superior Court shall conduct a separate hearing to determine whether the defendant should be sentenced to death or to life imprisonment without benefit of probation or parole as authorized by subsection (a) of this section. If the defendant was convicted of first-degree murder by a jury, this hearing shall be conducted by the trial judge before that jury as soon as practicable after the return of the verdict of guilty. Alternate jurors shall not be excused from the case prior to submission of the issue of guilt to the trial jury and shall remain separately sequestered until a verdict on guilt is entered. If the verdict of the trial jury is guilty of first-degree murder said alternates shall sit as alternate jurors on the issue of punishment. If, for any reason satisfactory to the Court, any member of the trial jury is excused from participation in the hearing on punishment, the trial judge shall replace such juror or jurors with alternate juror or

jurors. If a jury of 12 jurors cannot participate in the hearing a separate and new jury, plus alternates, shall be selected for the hearing in accordance with the applicable rules of the Superior Court and laws of Delaware, unless the defendant(s) and the State stipulate to the use of a lesser number of jurors.

(2) If the defendant was convicted of first-degree murder by the Court, after a trial and waiver of a jury trial or after a plea of guilty or nolo contendere, the hearing shall be conducted by the trial judge before a jury, plus alternates, empaneled for that purpose and selected in accordance with the applicable rules of the Superior Court and laws of Delaware, unless said jury is waived by the State and the defendant in which case the hearing shall be conducted, if possible, by and before the trial judge who entered the finding of guilty or accepted the plea of guilty or nolo contendere.

(c) *Procedure at punishment hearing.*—(1) The sole determination for the jury or judge at the hearing provided for by this section shall be the penalty to be imposed upon the defendant for the conviction of first-degree murder. At the hearing, evidence may be presented as to any matter that the Court deems relevant and admissible to the penalty to be imposed. The evidence shall include matters relating to any mitigating circumstance and to any aggravating circumstance, including, but not limited to, those aggravating circumstances enumerated in subsection (e) of this section. Notice in writing of any aggravating circumstances and any mitigating circumstances shall be given to the other side by the party seeking to introduce evidence of such circumstances prior to the punishment hearing, and after the verdict on guilt, unless in the discretion of the Court such advance notice is dispensed with as impracticable. The record of any prior criminal convictions and pleas of guilty or pleas of nolo contendere of the defendant or the absence of any such prior criminal

convictions and pleas shall also be admissible in evidence.

(2) At the hearing the Court shall permit argument by the State, the defendant and/or his counsel, on the punishment to be imposed. Such argument shall consist of opening statements by each, unless waived, opening summation by the State, rebuttal summation by the defendant and/or his counsel and closing summation by the State.

(3) Upon the conclusion of the evidence and arguments the judge shall give the jury appropriate instructions and the jury shall retire to determine the punishment to be imposed.

(4) In the instructions to the jury the Court shall include instructions for it to weigh and consider any mitigating circumstances or aggravating circumstances and any of the statutory aggravating circumstances set forth in subsection (e) of this section which may be raised by the evidence. The jury shall be instructed to weigh any mitigating factors against the aggravating factors.

(d) *Determination of sentence.*—(1) A sentence of death shall not be imposed unless the jury or judge, where appropriate, finds:

a. Beyond a reasonable doubt at least 1 statutory aggravating circumstance; and

b. Unanimously recommends, after weighing all relevant evidence in aggravation or mitigation which bears upon the particular circumstances or details of the commission of the offense and the character and propensities of the offender, that a sentence of death be imposed. Where the jury, or judge when applicable, submits such a finding and recommendation, the Court shall sentence the defendant to death as provided by subsection (f) of this section. A finding by the jury of a statutory aggravating circumstance, and a consequent recommendation of death, supported by the evidence, shall be binding on the Court.

(2) Refusal or failure of the Court to follow the jury's recommendation for any reason shall be appealable by the State as of right to the Supreme Court within 30 days after imposition of sentence.

(3) If the jury, or judge when applicable, cannot unanimously find that at least 1 statutory aggravating circumstance exists and cannot unanimously recommend death, the Court shall sentence the defendant to life imprisonment without benefit of probation or parole.

(e) *Aggravating circumstances.*—(1) In order for a sentence of death to be imposed, the jury, unanimously, or judge when applicable, must find that the evidence established beyond a reasonable doubt the existence of at least 1 of the following aggravating circumstances which shall apply with equal force to accomplices convicted of such murder.

a. The murder was committed by a person in, or who has escaped from, the custody of a law-enforcement officer or place of confinement.

b. The murder was committed for the purpose of avoiding or preventing an arrest or for the purpose of effecting an escape from custody.

c. The murder was committed against any law-enforcement officer, corrections employee or fireman, while such victim was engaged in the performance of his official duties.

d. The murder was committed against a judicial officer, a former judicial officer, Attorney General, former Attorney General, Assistant or Deputy Attorney General or former Assistant or Deputy Attorney General, State Detective or former State Detective, Special Investigator or former Special Investigator, during, or because of, the exercise of his official duty.

e. The murder was committed against a person who was held or otherwise detained as a shield or hostage.

f. The murder was committed against a person who was held or detained by the defendant for ransom or reward.

g. The murder was committed against a person who was a witness to a crime and who was killed for the purpose of preventing his appearance or testimony in any grand jury, criminal or civil proceeding involving such crime.

h. The defendant paid or was paid by another person or had agreed to pay or be paid by another person or had conspired to pay or be paid by another person for the killing of the victim.

i. The defendant was previously convicted of another murder or manslaughter or of a felony involving the use of, or threat of, force or violence upon another person.

j. The murder was committed while the defendant was engaged in the commission of, or attempt to commit, or flight after committing or attempting to commit any degree of rape, arson, kidnapping, robbery, sodomy or burglary.

k. The defendant's course of conduct resulted in the deaths of 2 or more persons where the deaths are a probable consequence of the defendant's conduct.

l. The murder was committed by means of torture, use of an explosive device or poison, or the defendant used such means on the victim prior to murdering him.

m. The defendant caused or directed another to commit murder or committed murder as an agent or employee of another person.

n. The murder was outrageously or wantonly vile, horrible or inhuman.

o. The defendant was under a sentence of life imprisonment, whether for natural life or otherwise, at the time of the commission of the murder.

p. The murder was committed for pecuniary gain.

q. The victim was pregnant.

r. The victim was severely handicapped, severely disabled or elderly.

s. The victim was defenseless.

(2) In any case where the defendant has been convicted of murder in the first degree in violation of any provision of § 636(a)(2)(7) of this title, that conviction shall establish the existence of a statutory aggravating circumstance and the jury, or judge where appropriate, shall be so instructed. This provision shall not preclude the jury, or judge where applicable, from considering and finding the statutory aggravating circumstances listed in this subsection and any other aggravating circumstances established by the evidence.

(f) *Method and imposition of sentence of death.*—The imposition of a sentence of death shall be upon such terms and conditions as the trial court may impose in its sentence, including the place, the number of witnesses and conditions of privacy. Punishment of death shall, in all cases, be inflicted by hanging by the neck and such sentence may not be carried out until final review thereof is had by the Delaware Supreme Court as provided for in subsection (g) of this section. The Court or the Governor may suspend the execution of the sentence until a later date to be specified, solely to permit completion of the process of judicial review of the conviction.

(g) *Automatic review of death penalty by Delaware Supreme Court.*—(1) Whenever the death penalty is imposed, and upon the judgment becoming final in the trial court, the recommendation on and imposition of that penalty shall be reviewed on the record by the Delaware Supreme Court. Absent an appeal having been taken by the defendant upon the expiration of 30 days after the sentence of death has been imposed, the Clerk of the Superior Court shall require a complete transcript of the punishment hearing to be prepared promptly and within 10 days after receipt of that transcript he shall transmit the transcript, together with a notice prepared by him, to the Delaware Supreme Court. The notice shall set forth the title and docket number of the case, the name of the defendant, the name and address of any attorney and a narrative statement of the judgment, the offense and the punishment prescribed. The Court shall, if necessary,

appoint counsel to respond to the State's positions in the review proceedings.

(2) The Supreme Court shall limit its review under this section to the recommendation on and imposition of the penalty of death and shall determine:

a. Whether, considering the totality of evidence in aggravation and mitigation which bears upon the particular circumstances or details of the offense and the character and propensities of the offender, the death penalty was either arbitrarily or capriciously imposed or recommended, or disproportionate to the penalty recommended or imposed in similar cases arising under this section.

b. Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in subsection (e) of this section and, where applicable, § 636(a)(2)(7) of this title.

(3) The Supreme Court shall permit the defendant and the State to submit briefs within the time provided by the Court, and permit them to present oral argument to the Court.

(4) With regard to review of the sentence in accordance with this subsection, the Court shall:

a. Affirm the sentence of death.

b. In cases where the trial court erroneously rejected the jury's recommendation of the death sentence, remand with directions to reinstate the jury's recommendation and to impose the penalty of death.

c. Set aside the sentence of death and remand for correction of any errors occurring during the hearing and for imposition of the appropriate penalty. Such errors shall not affect the determination of guilt and shall not preclude the reimposition of death where appropriately determined after a new hearing on punishment.

d. Set forth its findings as to the reasons for its actions.

(h) *Ordinary review not affected by section.*—Any error in the guilt phase of the trial may be raised as provided by law and rules of court and shall be in addition to the review of punishment provided by this section. (11 Del.C. 1953, § 4209; 58 Del. Laws, c. 497, § 2; 59 Del.Laws, c. 284, § 2; 61 Del.Laws, c. 41, § 1.)

## APPENDIX B

§ 636. **Murder in the first degree; class A felony.**

(a) A person is guilty of murder in the first degree when:

(1) He intentionally causes the death of another person;

(2) In the course of and in furtherance of the commission or attempted commission of a felony or immediate flight therefrom, he recklessly causes the death of another person;

(3) He intentionally causes another person to commit suicide by force or duress;

(4) He recklessly causes the death of a law-enforcement officer, corrections employee or fireman while such officer is in the lawful performance of his duties;

(5) He causes the death of another person by the use of or detonation of any bomb or similar destructive device;

(6) He, with criminal negligence, causes the death of another person in the course of and in furtherance of the commission or attempted commission of rape, kidnapping, arson in the first degree, robbery in the first degree, or immediate flight therefrom;

(7) He causes the death of another person in order to avoid or prevent the lawful arrest of any person, or in the course of and in furtherance of the commission or attempted commission of escape in the second degree or escape after conviction.

## APPENDIX C

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
IN AND FOR COUNTY

| | |
|---|---|
| STATE OF DELAWARE, <br> Plaintiff, <br><br> v. <br><br> WILLIAM HENRY FLAMER , <br> Defendant. | § <br> § <br> § <br> § <br> § <br> § <br> § <br> § |

No. Cr. A. #IK-79-11-0236
IK-79-11-0237
IK-79-11-0238.
IK-79-11-0239

TO: THE SUPREME COURT OF THE STATE OF DELAWARE.

The Trial Judge in this case, in which the defendant was indicted for murder in the first degree, herewith submits this report, based upon the record in the case and data prepared by the Pre-Sentence Office:

Sentence Imposed: Death

SUPERIOR COURT OF THE STATE
RECEIVED and FILED
FEB 15 1980
J. E. TOWNSEND, Jr.
Clerk

### A. Data Concerning Defendant

1. Name _Flamer_ _William_ _Henry_ 2. Date of Birth 11/10/54
 Last First Middle Mo. Day Y)

 Address _147 Mispillion St_ _Harrington, DE_ _19952_
 Street City State Zi)

3. Social Security Number _____

4. Sex: M [X] F [ ]

5. Marital Status: Never Married [ ] Married [ ] Divorced [ ]. Spouse Deceased [ ]
 Married & Separated [x]

6. Children
 (a) Number of children ___1___
 (b). Ages of children: 1 2 ③ 4 5 6 7 8 9 10 11 12 .13 14 15 16 17 18 over 18
 (Circle age of each child)

7. Father living: Yes [x] No [ ] If deceased, give date of death _____

8. Mother living: Yes [x] No [ ] If deceased, give date of death _____

9. Number of children born to parents _____

10. Education — Highest Grade Completed: 1 2 3 4 5 6 7 8 ⑨ 10 11 12 13 14 15 16 1'
 (Circle one) [ College

11. Intelligence Level: Low (IQ below 70) [ ] Medium (IQ 70 to 100) [x]
 High (IQ above 100) [ ]

12. Is defendant physically handicapped? Yes [ ] No [X] If answer is affirmative, explai)

13. Is defendant mentally handicapped? Yes [ ] No.[x] If answer is affirmative, explain:

14. Psychiatric Evaluation Performed: Yes [x] No [ ]
 (a) If performed, does it state affirmatively that defendant can:
 (1) Distinguish right from wrong? Yes [x] No [ ]
 (2) Adhere to the right? [x] [ ]
 (3) Cooperate intelligently in his own defense? [x] [ ]
 (b) If performed, were character or behavior disorders found? Yes [ ] No [ ]
 If answer is affirmative, explain: _alcoholism_

 (c) What other pertinent psychiatric [and psychological] information was revealed?
 _No symptoms of psychosis or any other mental illness_

15. Work record (last 10 years):
 Type of Job Pay Dates Held Reason for Termination
 (a) _horse groom-defendant employed off and on during several years' period_

## APPENDIX C—Continued

(b) by various horse owners. In addition, he has held other menial jobs
(c) for short periods of time.
(d)
(e)

16. Does defendant have a record of prior convictions as an adult? Yes [X] No [ ]
17. If the answer is affirmative, list each offense, the date of the offense, and the sentence imposed.

| Offense | Date of Offense | Sentence Imposed |
|---|---|---|
| (a) See enclosed Exhibit | (Attached Exhibit A) | |
| (b) | | |
| (c) | | |
| (d) | | |

18. Was defendant a local resident or transient in the community? Resident [X] Transient [ ]

### B. Data Concerning the Trial

1. Was the case tried with a jury? Yes [X] No [ ]
2. How did defendant plead? Guilty [ ] Not Guilty [X]

### C. Offense Related Data

1. On what ground was defendant found guilty? See 11 Del.C. § 636.
 (a) Defendant intentionally caused the death of another person. [X]
 (b) In the course of and in furtherance of the commission or attempted commission of a felony or immediate flight therefrom, defendant recklessly caused the death of another person. [X]
 (c) Defendant intentionally caused another person to commit suicide by force or duress. [ ]
 (d) Defendant recklessly caused the death of a law enforcement officer, corrections employee or fireman while such officer was in the lawful performance of his duties. [ ]
 (e) Defendant caused the death of another person by the use of or detonation of a bomb or similar destructive device. [ ]
 (f) Defendant, with criminal negligence, caused the death of another person in the course of and in furtherance of the commission or attempted commission of rape, kidnapping, arson in the first degree robbery in the first degree, or immediate flight therefrom. [X]
 (g) Defendant caused the death of another person in order to avoid or prevent the lawful arrest of any person, or in the course of and in furtherance of the commission or attempted commission of escape in the second degree or escape after conviction. [ ]
2. Were other offenses tried in the same trial? Yes [X] No [ ]
 If the answer is affirmative, list those offenses and the verdict as to each.
 (a) Poss. D/W D/C of a Felony — Guilty [X] Not Guilty [ ]
 (b) Robbery First Degree — Guilty [X] Not Guilty [ ]
 (c) Felony, Theft - (found guilty of misdemeanor theft). — Guilty [X] Not Guilty [ ]
 (d) — Guilty [ ] Not Guilty [ ]
3. Was any other person indicted for the homocide for which this defendant has been convicted? Yes [X] No [ ]
4. How did any such other person plead? No Guilty
5. Was any such other person convicted of the offense charged? Yes [ ] No [X]
6. What sentence was imposed on any such other person? (Trial Pending)
7. If tried by jury, did the jury recommend the death sentence? Yes [X] No [ ]
8. Was a statutory aggravating circumstance found in the trial of this defendant? See 11 Del.C. § 4209(e) Yes [X] No [ ]
9. Which of the following statutory aggravating circumstances was instructed and which was found?

| | Instructed | Found |
|---|---|---|
| (a) The murder was committed by a person in, or who has escaped from, the custody of a law-enforcement officer, or place of confinement. | [ ] | [ ] |
| (b) The murder was committed for the purpose of avoiding or preventing an arrest or for the purpose of effecting an escape from custody. | [ ] | [ ] |
| (c) The murder was committed against any law-enforcement officer, corrections employee or fireman, while such victim was engaged in the performance of his official duties. | [ ] | [ ] |

9. (continued)

| | | Instructed | Found |
|---|---|---|---|
| (d) | The murder was committed against a judicial officer, a former judicial officer, Attorney General, former Attorney General, Assistant or Deputy Attorney General or former Assistant or Deputy Attorney General, State Detective or former State Detective, Special Investigator or former Special Investigator, during, or because of, the exercise of his official duty. | [ ] | |
| (e) | The murder was committed against a person who was held or otherwise detained as a shield or hostage. | [ ] | [ ] |
| (f) | The murder was committed against a person who was held or detained by defendant for ransom or reward. | [ ] | [ ] |
| (g) | The murder was committed against a person who was a witness to a crime and who was killed for the purpose of preventing his appearance or testimony in any grand jury, criminal or civil proceeding involving such crime. | [ ] | [ ] |
| (h) | Defendant paid or was paid by another person or had agreed to pay or be paid by another person or had conspired to pay or be paid by another person for the killing of the victim. | [ ] | [ ] |
| (i) | Defendant was previously convicted of another murder or manslaughter or of a felony involving the use of, or threat of, force or violence upon another person. | [ ] | [ ] |
| (j) | The murder was committed while defendant was engaged in the commission of, or attempt to commit, or flight after committing or attempting to commit any degree of rape, arson, kidnapping, robbery, sodomy or burglary. | [x] | [✓] |
| (k) | Defendant's course of conduct resulted in the deaths of 2 or more persons where the deaths are a probable consequence of defendant's conduct. | [x] | [✗] |
| (l) | The murder was committed by means of torture, use of an explosive device or poison, or defendant used such means on the victim prior to murdering him. | [ ] | [ ] |
| (m) | Defendant caused or directed another to commit murder or committed murder as an agent or employee of another person. | [ ] | [ ] |
| (n) | The murder was outrageously or wantonly vile, horrible or inhuman. | [x] | [x] |
| (o) | Defendant was under a sentence of life imprisonment, whether for natural life or otherwise, at the time of the commission of the murder. | [ ] | [ ] |
| (p) | The murder was committed for pecuniary gain. | [x] | [x] |
| (q) | The victim was pregnant. | [ ] | [ ] |

10. List nonstatutory aggravating circumstances in evidence, if any.
 (a) felony record of defendant
 (b) age of victims
 (c) relative size of victim, Alberta Smith
 (d) relationship of defendant to victims (nephew)

11. (a) Was there evidence of mitigating circumstances? Yes [x] No [ ]
 (b) If the answer to 11 (a) is affirmative, list any such mitigating circumstance in evidence:
 (1) alcholism
 (2) low mentality
 (3) defendant did not act alone and not liable for actions of co-defendant.
 (4) unstable lifestyle.

12. If tried with a jury, was the jury instructed to consider mitigating circumstances?
 Yes [x] No [ ]

13. Was a weapon used in commission of the crime? Yes [x] No [ ]
 If the answer is affirmative, was the weapon: Poison [ ] Motor Vehicle [ ]
 Blunt Instrument [ ] Sharp Instrument [x] Firearm [ ] Other [ ]

14. Was there evidence that defendant was under the influence of narcotics or dangerous drugs at the time of the offense? Yes [ ] No [x] If answer is affirmative, explain: _____
_____

D. Data Concerning The Victim (Additional information on Victim No. 2 attached)

1. Name: _____Smith_____Alberta_____
 Last First Middle

2. Date of Birth: 12 18 1909 3. Sex: M [ ] F [x]
 Mo. Day Yr.

4. Was the victim related by blood or marriage to defendant? Yes [x] No [ ]
5. If the answer is affirmative, what was the relationship? Aunt - Mother's Sister
 _____

6. Was the victim an employer or employee of defendant? No [X] Employer [ ]
 Employee [ ]
 [X] Relative
7. Was the victim acquainted with defendant? No [ ] Casual Acquaintance [ ] Friend [ ]
8. Was the victim a local resident or transient in the community? Resident [x] Transient [ ]
9. Was the victim of the same race as defendant? Yes [x] No [ ]
10. Was the victim of the same sex as defendant? Yes [ ] No [x]
11. Was the victim held hostage during the crime? No [x] Yes - Less than an hour [ ]
 Yes - More than an hour [ ]
12. What was the victim's reputation in the community? Good [x] Bad [ ] Unknown [ ]
13. Did the victim have a record of prior convictions as an adult? Yes [ ] No [x]
14. If the answer is affirmative, list each offense, the date of the offense, and the
 sentence imposed.
 Offense Date of Offense Sentence Imposed
 (a)_____
 (b)_____
 (c)_____
 (d)_____
15. Was the victim physically abused? Yes [x] No [ ] If the answer is affirmative,
 explain: stabbed repeatedly with a knife.
 _____

### E. Representation of Defendant

1. Date counsel secured 2/7/79
2. Was counsel: (a) a Public Defender [x] (b) Retained by defendant [ ]
 (c) Appointed by the Court [ ]
3. If counsel was appointed by the Court, was it because: (a) Defendant was unable to
 afford counsel? [ ] (b) Defendant refused to secure counsel? [ ] (c) Other (explain)

4. Was defendant represented by the same counsel throughout the trial? Yes [x] No [ ]
5. If not, explain _____
 _____

### F. General Considerations

1. Was race raised by defendant as an issue at trial? Yes [ ] No [x]
2. Did race otherwise appear as an issue at trial? Yes [ ] No [x]
3. What percentage of the population of the County is the same race as defendant?
 (a) Under 10% [ ] (b) 10 to 25% [x] (c) 25 to 50% [ ] (d) 50 to 75% [ ]
 (e) 75 to 90% [ ] (f) Over 90% [ ]
4. Were members of defendant's race represented on the jury? Yes [x] No [ ]
5. Was the jury instructed to exclude race as an issue? Yes [ ] No [x]
6. Was the jury instructed to disregard community publicity about the case? Yes. [x] No [ ]
7. Was the jury instructed to avoid any influence of passion, prejudice, or other arbitrary
 factor during deliberation? Yes [x] No [ ]
8. Was the punishment hearing held before the same jury which sat at the guilt phase of the
 trial? Yes [x] No [ ] If not, state the reason and any additional information deemed
 important to this report as the result thereof: _____
 _____
 _____

### G. Chronology of Case

| | | Elapsed Days |
|------------------------------|----------|--------------|
| 1. Date of Offense | 2/7/79 | |
| 2. Date of Arrest | 2/7/79 | 0 |
| 3. Date Trial Began | 1/24/80 | 352 |
| 4. Date Sentence Imposed | 2/12/80 | 372 |
| 5. Date post trial motions ruled on | | |

6. Date Trial Judge's Report Completed 2/15/80 375
7. Total elapsed days 375

If more than one attorney represents defendant, answer the questions as to each attorney and attach to this report.

This report was submitted to the Attorney General and to defendant's counsel for comments concerning the factual accuracy of the report, and

 1. Such comments are attached ( )

 2. Counsel stated that no comments would be submitted ( )

 3. Counsel has not responded ( )

4. Report was reviewed in person with Attorney General and Defense Counsel.

February 15, 1980
Date

Judge, Superior Court

*****
Use this space for additional comments, if necessary.

```
Victim #2 - Smith, Byard
 D.O.B. 3/12/10 Male
 4. Blood Relative or Marriage - Yes
 5. Uncle by Marriage
 6. No.
 7. Victim was acquainted
 8. Resident
 9. Same Race
 10. Same Sex
 11. No - not held hostage
 12. Good Reputation
 13. Unknown - If yes, not believed serious offenses
 14. N/A
 15. Yes - stabbed repeatedly with a knife.
```

### EXHIBIT A

ADULT CRIMINAL RECORD OF WILLIAM HENRY FLAMER

12/10/72—Assault & Battery—Hammonton, N.J.—No Disposition Given

10/19/73—Enter Bar Under Age—Court # 6—Pd. $10 & $7.50

1/16/74—Worthless Checks (5)—Court # 6—4 months, 10 days; Damaging Property—2 days

2/1/74—Worthless Check—Court # 7—8 months imprisonment. Theft—misdemeanor—Superior Court—6/7/74, Judge Wright ordered costs, 1 year, last 3 months suspended, 1 year probation.

3/15/75—Unauthorized Use of M/V—Court # 6—Dismissed.

10/29/75—Forgery 2nd Degree (5 charges)—Superior Court 5/7/76—Judge Longobardi—(1) Costs, 4 years imprisonment, after 18 months, remainder suspended with probation (2) Same sentence to run concurrent—Three charges Nolle Prossed.

10/29/75—Theft (M)—Court # 6—Costs & $100 fine.

12/8/75—Capias—Failed to appear for arraignment on 10/29/75 charges. Returned 1/13/76.

10/7/77—Offensive Touching—Court # 6—$10 fine and costs.

3/12/78—Disorderly Conduct—Milford Alderman—$10 fine, costs, 5 days suspended.

3/24/78—Shoplifting—Court # 6—$50 fine and costs.

## APPENDIX D

### LIST I

#### CASE DISMISSED or NOLLE PROSSED

| | | | |
|---|---|---|---|
| 1. | Roosevelt Little | (dismissed) | 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 |
| 2. | Rickie T. Thompson | (NP) | IK81-09-0058 |
| 3. | Michael Williams | (NP) | IK82-05-0078 |
| | | | IK82-06-0840 |
| | | | IK82-05-0079-80 |
| 4. | Thomas Kempski | (NP - died) | IN80-01-0831 |
| 5. | Tyrone Brookins | (NP) | IN80-07-0868 |
| 6. | Japhis Lampkin | (NP) | IN80-07-0872 |
| 7. | William Blackledge | (NP) | IN81-02-0865 |
| 8. | Angela Jackson | (NP) | IN80-12-0472 |
| 9. | Jacqueline Miller | (NP - died) | IN82-01-1103 |
| 10. | Samuel Carlton | (NP) | IN82-03-1772 |
| 11. | Wilbur Ball | (NP) | IN83-07-1730 |
| 12. | James Townsend | (NP) | IN83-07-1732 |
| 13. | Robert Meades | (NP) | In83-07-1827 |

## APPENDIX E

### LIST II

#### CASES PENDING TRIAL

| | | | |
|---|---|---|---|
| 1. | Jackie Ray Lovett | IS82-07-0022 | (Set for 9/10/84) |
| 2. | William Lee Gaines | IS83-09-0078 | (Mistrial declared) |
| 3. | Roland Daniels | IK83-02-0006 | (Tentative date 10/2/84) |
| 4. | James M. Elliotte | KN81-11-0834 | (Set for 10/1/84) |
| 5. | Joseph Walls | IN84-04-0300 | (Set for 10/15/84) |
| 6. | Suzanne Triano | IN84-05-1701 | (Awaiting psychological testing results) |

## APPENDIX F
### LIST III

#### NEW INFORMATION FILED WITH REDUCED CHARGES

| | | |
|---|---|---|
| 1. | Gary Allen Connelly | I77-12-0008 |
| 2. | Jerry Lee Connelly | I77-12-0003 |
| 3. | Jeffrey Messick | I77-11-0067 |
| 4. | Frank C. Weick | I77-12-0072 |

APPENDIX G

LIST IV

PLED GUILTY TO LESSER CHARGE

| | | |
|---|---|---|
| 1. | Mitchell A. Thompson | I77-08-0009 |
| 2. | Shirley Mae Pryor | I77-10-0026 |
| 3. | Eleanor Waller | I77-10-0057 |
| 4. | Bobby A. Anderson | I77-10-0064 |
| 5. | Jerry J. Hicks | I77-09-0060 |
| 6. | John R. Rosciolo | IS78-11-0030 |
| 7. | Paul S. McCreary | IS79-03-0001 |
| 8. | Melvin L. Jenkins | IS79-06-0009 |
| 9. | Anna Mae Collick | IS79-09-0046 |
| 10. | Quinton D. Collick | IS79-09-0049 |
| 11. | Joseph Baker | IS81-04-0032 |
| 12. | Thomas L. Hughes | IS81-09-0125 |
| 13. | Cindy Lou Moore | IS81-09-0117 |
| 14. | Richard Irwin | IS81-09-0109 |
| 15. | Hunter J. Clark III | IS81-12-0136 |
| 16. | Theodore Hitchens | IS82-04-0424 |
| 17. | Charles Amon Bower | IS82-07-0026 |
| 18. | Thomas R. Young | IS77-09-0001 |
| 19. | Wendy McCray | IS83-05-0049 |
| 20. | Clay Cooper | IK78-11-0234 (Robinson Plea) |
| 21. | Samuel L. Gentry | IK79-11-0039 (Robinson Plea) |
| 22. | Daniel Bell | IK80-03-0032 |
| 23. | Michael Clough | IK80-10-0176 |
| 24. | William J. Ryan | IK81-12-0031 |
| 25. | Franklin Harvey | IK82-09-0001 |
| 26. | Kevin D. Dixon | IK82-12-0048 |
| 27. | James W. Bolder | IK83-04-0075 |
| 28. | Lewis Pratcher | I77-08-0129 |
| 29. | Delores Matthews | I78-05-0324 |
| 30. | James S. Harris, Jr. | I78-06-0950 |
| 31. | Andre S. Deputy | IN78-07-0827 |
| 32. | Steven A. White | IN78-10-0830 |
| 33. | Courtland Walker | IN78-09-0182 |
| 34. | Sabrino Barber | IN79-01-0848 |
| 35. | Lamotte R. Williams | IN79-02-0439 |
| 36. | Ernest Patrick | In79-04-0482 |
| 37. | Christopher Singer | IN79-04-0484-FT |
| 38. | Joseph Moyer | IN79-06-0099 |
| 39. | Danny Jarrell | IN79-06-0328 |
| 40. | Archie Thomas | IN79-08-0831 |
| 41. | Sidney Carwood | IN79-11-0243 |
| 42. | Kevin Hollis | In80-01-0897/IN80-05-0905 |
| 43. | Richard Alan Davis | IN80-01-0268 |
| 44. | Gerald Wegman | IN80-02-1007 |
| 45. | Stephen Muxo | IN80-05-0369 |
| 46. | Derek Davis | IN80-05-1176 |
| 47. | Thomas Butler | In80-07-0876 |
| 48. | Tyrone Carney | IN80-07-0341 |
| 49. | Clifton Garden | IN80-09-0240 |
| 50. | Helen Hendrickson | IN80-11-0067 |
| 51. | Leamond Pierce | IN80-02-0863 |
| 52. | Kirk L. Benson | IN81-05-0377 |
| 53. | Joseph Wheeler | IN81-07-0159FC |
| 54. | Jonothan Jones | IN81-10-0922 |

| | | |
|---|---|---|
| 55. | Albert M. Robinson, Jr. | IN81-12-0457 |
| 56. | James Terrell | IN81-11-0369 |
| 57. | Darryl Fisher | IN81-12-0681FC |
| 58. | Elaine Brown | IN82-01-0361 |
| 59. | Charles Abney | IN82-06-0394 |
| 60. | Mark McCoy | IN82-07-1591-93 |
| 61. | Cleveland Boyce | IN82-08-0299 |
| 62. | Walter Hamann | IN82-12-0478 |
| 63. | Michael McCloskey | IN81-04-0829 |
| 64. | Christine Copeland | IN83-04-1796 |
| 65. | Derrick Johnson | IN83-07-1724 |
| 66. | Ernest L. Brookins | IN83-09-1541 |
| 67. | Robert E. Brophy | IN83-12-0543 |
| 68. | Johnnie Fomby | IN83-01-0587 |
| 69. | Diane Miller | N83-01-0335-I |
| 70. | Donald F. Cagnon, Jr. | IN78-09-0992 |
| 71. | Thomas Mahon | IK82-09-0003 |
| 72. | Robert D. Kriedler | IK80-05-0061 |
| | | (Nolle-prossed as to Murder I-Defendant testified against a co-defendant - Pled to Murder II) |
| 73. | Nathaniel Plass | IK80-05-0083 |
| | | (Penalty Hearing Held - Sentenced to life - Remanded by this Court - Pled to Manslaughter). |

## APPENDIX H

### LIST V

#### A. NO PENALTY HEARING HELD

##### a. Found Guilty of Lesser Included Offense Only

| | | |
|---|---|---|
| 1. | Ernest Waters | IK78-09-0024 |
| 2. | William Paskins | IK81-03-0016 |
| 3. | William Fensterer | IK81-11-0029 |
| 4. | Walter J. Evans | I77-08-0324 |
| 5. | James C. Pritchett | I77-11-0273 |
| 6. | Johnnie B. Johnston | I78-04-0961 |
| 7. | Robert Williams | I78-05-0966 |
| 8. | Oscar Handy | IN78-08-0120 |
| 9. | Eusebio Rodriguez | IN80-08-0824 |
| 10. | William A. Hopkins | IN81-11-0432 |
| 11. | Rafael Diaz | IN80-07-0267 |

##### b. Defendant Pled Guilty to Murder in First Degree

| | | |
|---|---|---|
| 1. | James K. Albury | IS79-12-0074 |
| 2. | William Lee Gaines | IS83-04-0034 |
| 3. | Donald Connelly | IK81-01-0058 |
| 4. | Tyrone R. Baxter | IK82-05-0051 |
| | | IK82-06-0839 |
| | | IK82-11-0001 |
| 5. | Michael McCloskey | IN81-04-0829 |
| | | (Guilty Murder I, sentenced to life, reversed on appeal, Pled to Murder I) |
| 6. | Effran Cobb | IK83-08-0036 |

c. Death Penalty Not Sought

| | | |
|---|---|---|
| 1. | George W. Gray | I77-10-0055 |
| 2. | Robert Van Arsdall | IK82-01-0073 |
| 3. | Felix Cruet | IN80-09-0006 |
| 4. | Michael Chaplin | IN80-08-0625 |
| | | (invalid statutory aggravating circumstance) |
| 5. | Percy Ewell Wainwright | IS82-11-0061 |
| | | (Enmund found applicable) |
| 6. | Richard H. Wilson | IN83-12-0155 |
| 7. | Leon Powell | IN82-11-0311 |

d. Defendant Found Not Guilty as Charged

| | | |
|---|---|---|
| 1. | Christopher Mangles | IN78-12-0208 (All Counts) |
| 2. | Daniel C. Pregent | IK82-01-0075 |
| 3. | Kathleen Matta | IN78-06-0088 |
| | | (Not Guilty - Mental Illnes |
| 4. | Arnold Johnson | IN80-02-0379 |
| 5. | Glen Henry Johnson | IN80-12-0882 |
| | | (Not Guilty - Mental Illne |

APPENDIX I

LIST VI

## PENALTY HEARING HELD - LIFE SENTENCE IMPOSED - NO STATUTORY AGGRA-VATING CIRCUMSTANCES FOUND

| | | |
|---|---|---|
| 1. | Coy E. Bailey | IK78-06-0053 |
| 2. | William M. McKinney | IN80-08-0354 |
| 3. | Lawrence Dickens | IN79-08-0371 |
| 4. | Gibson Hall | IN79-08-0026 |
| 5. | Paul Hickman, Jr. | I78-05-0965 |
| 6. | James J. Conlow, Jr. | IN78-09-0985 |

APPENDIX J

LIST VII

## DEATH PENALTY IMPOSED

| | | |
|---|---|---|
| 1. | Frank C. Whalen | IK77-09-0036 |
| 2. | Andre Deputy | IK79-03-0009-10 |
| 3. | William H. Flamer | IK79-03-0017-18 |
| 4. | Billy Bailey | IK79-05-0087-88 |
| 5. | James W. Riley | IK82-05-0058 |
| | | IK82-06-0838 |
| 6. | David Rush | IN80-10-0932 |

STATUTORY AGGRAVATING CIRCUMSTANCE FOUND – LIFE SENTENCE

| | | |
|---|---|---|
| 1. | Judith McBride | IK80-05-0059 |
| 2. | Frank L. Ross | IK80-05-0063 |
| 3. | Richard Massey | I77-11-0973 |
| 4. | Robert J. Martin | I77-11-0983 |
| 5. | Tyrone Brookins | IN80-07-0855 |
| 6. | Japhis Lampkins | IN80-07-0861 |
| 7. | Ballard Boatson | IN81-06-0403 |
| 8. | James L. Blount, Jr. | IN83-03-1944 |
| 9. | James W. Waller | I77-10-0061 |
| 10. | David W. Dodson | IS81-10-0084 |
| 11. | Charles F. Blizzard | IN83-09-0590 |
| 12. | Ronnie E. Cordell | IN83-10-1619 |